# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JUNE SESSION, 1999

**FILED**

**August 19, 1999**

Cecil Crowson, Jr.
Appellate Court Clerk



| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 02C01-9902-CC-00063 |
| | ) | |
| Appellee, | ) | |
| | ) | LAUDERDALE COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. JOSEPH H. WALKER, JUDGE |
| BARRY DAVIS, | ) | |
| | ) | |
| Appellant. | ) | (FIRST DEGREE MURDER) |


FOR THE APPELLANT:                    FOR THE APPELLEE:

GARY F. ANTRICAN                      PAUL G. SUMMERS
District Public Defender              Attorney General & Reporter

JULIE K. PILLOW                       R. STEPHEN JOBE
Assistant Public Defender             Assistant Attorney General
P.O. Box 700                          2nd Floor, Cordell Hull Building
Somerville, TN  38068                 425 Fifth Avenue North
(At Trial)                            Nashville, TN  37243

CLIFFORD K. McGOWN, JR.                   ELIZABETH T. RICE
113 North Court Square                District Attorney General
Waverly, TN  37185
(On Appeal Only)                      JAMES WALTER FREELAND, JR.
                                      Assistant District Attorney General
                                      302 Market Street
                                      Somerville, TN  38068


OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Barry Davis, appeals as of right from his convictions in the Circuit Court of Lauderdale County. Following a jury trial, Defendant was convicted of first degree murder and assault. The trial court sentenced Defendant to life imprisonment for first degree murder and to a concurrent sentence of eleven (11) months and twenty nine (29) days for assault. Defendant presents the following two issues for review in this appeal:

> 1. Was the evidence sufficient to support Defendant's conviction for first degree murder; and
>
> 2. Did the trial court abuse its discretion in permitting certain rebuttal argument from the State.

After a careful review of the record, we affirm the judgment of the trial court.

## Summary of the Facts

On the morning of December 6, 1997, Defendant went to the home of the victim, Mary Robinson, and stabbed her 14 times. The victim died as a result of the multiple stab wounds. The victim was the mother of two of Defendant's children. During this offense, Defendant also wounded their eight year old daughter, Lashona.

Lashona testified at trial that on the morning of the offense, the only people home were herself, her younger brother, and the victim (her mother), who was still in bed. Lashona's fifteen year old brother had already left the home and gone to his grandmother's house. Defendant arrived at the home as Lashona and her brother were watching cartoons on television. Lashona opened the door and let the

Defendant into the home. Once inside, Defendant sat down and asked the children how they were doing. He went to the kitchen to get a drink of water and then returned to the living room momentarily. Lashona denied that Defendant cooked any breakfast, as contrasted by Defendant's later testimony, because she and her brother had just finished eating soup when Defendant arrived. Defendant then proceeded to the bedroom where the victim was, and Lashona heard Defendant ask the victim if she would take him to Memphis. The victim replied that she did not feel well. According to Lashona, this was the extent of the conversation between Defendant and the victim.

At this point, Lashona heard banging in the bedroom and walked back there to investigate. Once inside her mother's bedroom, she saw Defendant stabbing the victim. Defendant stabbed the victim while she was on the bed, then grabbed her and threw her on the floor, where he stabbed her again. Lashona attempted to stop Defendant from stabbing her mother by wrapping her arms around his waist. Defendant told her to get out of his way and he pushed her to the floor, cutting her with the knife in the process.

After the stabbing, Defendant looked through the victim's purse and retrieved her keys. As he walked outside to leave, Lashona and her brother followed and called for him not to leave, but he told them to go back in the house. Defendant left in the victim's car and Lashona called the police.

Deputy Ted Sutton of the Lauderdale County Sheriff's Department testified that shortly after the offense he received a phone call from Defendant. Defendant stated that he had killed the victim and wanted to turn himself in to the authorities.

When asked what he had done with the knife, Defendant replied that he had thrown it out of the car as he drove away from the victim's residence. Defendant was not crying and asked if the victim was dead "for sure."

Officer Chris Bailey of the Ripley Police Department responded to Lashona's emergency call. Upon arriving at the residence, Lashona and her younger brother were screaming "Barry stabbed my mama." Officer Bailey located the victim in the bedroom but could not find a pulse. He testified that there were not typical indications of a struggle in the bedroom. Specifically, furniture and lamps were all in their normal places. There was blood on the bed, the floor, and splattered on the walls of the bedroom. Officer Bailey later saw Defendant at the hospital at which point Defendant kept repeating that he did not mean to kill the victim. Defendant was crying at this time.

Terry Jordan, an investigator with the Ripley Police Department, also responded to the scene. He saw Lashona with her face bandaged and tears streaming down her face saying, "Don't let my mama die." Investigator Jordan later recovered a blood-stained steering wheel cover from the victim's vehicle. Jordan took a statement from Defendant, during which Defendant said he had thrown the knife out of the victim's car into the median on the Highway 51 bypass. Defendant helped search the area but the weapon was not located. However, Investigator Jordan retraced Defendant's path of flight from the scene the following day and located the knife in a ditch on the side of the road only half a mile from the victim's residence. Jordan also recovered a fork.

Forensic testing revealed the presence of human blood on both the knife and the fork. Additionally, an autopsy revealed that the victim died as a result of multiple stab wounds. There were fourteen stab wounds in all, one to the head, three to the neck, two to the abdomen, and eight to the back. Some of the stab wounds were more than six inches in depth. The victim also had contusions on the left upper chest. She had no defensive wounds.

Joseph Lee, a longtime acquaintance of Defendant, testified that he had been working with Defendant during the week preceding the killing. During that week, Defendant repeatedly talked about how much he loved the victim and said that if he could not have her then nobody else could either. He repeatedly stated that he was going to kill the victim, but Lee did not take him seriously. Lee testified that he saw Defendant with a knife on the morning of the stabbing saying that he was going to sharpen the knife because he had to "take care of some business."

On cross-examination, Lee admitted that the victim was his second cousin. He also admitted that he did not give police a statement until January 28, 1998, more than one month after the killing. He said that he had not done so because the police had not asked him for a statement. Lee also admitted that he did not mention seeing Defendant with a knife during his statement, but stated that he simply did not have a chance to write everything down that he wanted to. Lee denied having approached Defendant's sister and asking her what had happened during the killing.

Alonzo Pickett, a neighbor of Defendant's sister and an acquaintance of Defendant, testified that Defendant was living with his (Defendant's) sister and her boyfriend in early December of 1997. Pickett testified that on the day before the

stabbing, Defendant visited Pickett and asked if he could borrow a file to sharpen a knife. Defendant sharpened the knife and then left. Pickett testified that the knife identified as the murder weapon resembled the knife Defendant had sharpened at his home. On cross-examination, Pickett admitted that he could not positively identify the knife. In contrast to Defendant's later testimony, Pickett also stated that Defendant had never borrowed his tools before.

Ricky Henderson, the boyfriend of Defendant's sister, testified that on the day before the killing, he and Defendant had a conversation about guns. Defendant indicated that he might like to purchase a shotgun. Defendant stated that Henderson's single shot shotgun was not good enough, but seemed interested in Henderson's father's three-shot shotgun. However, the asking price was too high for Defendant. Henderson also saw Defendant leave their residence with a knife in his back pocket on the day before the killing. The knife resembled the knife identified as the murder weapon. Henderson said that Defendant had asked him not to mention anything about their shotgun conversation. On cross-examination, Henderson stated that he had seen Defendant leave on the morning of the killing and that he did not see a knife in his back pocket.

Defendant offered the testimony of his sister, Denise Estes. Estes testified that she asked Defendant to sharpen the knife at Alonzo Pickett's in order to repair her cable television. Estes also testified that Joseph Lee, contrary to his earlier testimony, had indeed approached her and asked her what had happened during the killing.

Defendant testified on his own behalf. He stated that he had a good relationship with the victim and that they had arranged to go to Memphis together on the morning of the killing. Defendant called the victim to confirm their trip the night before. He called from another women's house, but told the victim that he was at a phone booth. The victim, who had caller identification on her telephone, hung up on Defendant.

Defendant came to the victim's residence the next day. He confirmed watching television with the children for a short time. Contrary to Lashona's testimony, however, Defendant stated that he went into the kitchen and fixed himself and his three-year-old son a sandwich. Defendant stated that he knew the victim was still mad, and when he went to her bedroom door, she rushed him with a knife. He said that they scuffled and that he took the knife from her and laid it on a dresser. They continued to scuffle and the victim eventually bit Defendant. At that point, she retrieved the knife from the dresser. Defendant was cut on his hands in the process of defending himself, but eventually disarmed the victim. At that point, Defendant stated that the victim slapped him and rushed at him with a fork.

Defendant testified that he "just clicked" and attacked the victim. He did not recall exactly what happened or how badly the victim was injured. Afterwards, he fled in panic because Lashona had already called an ambulance, and according to Defendant, the police were already hunting for him on an unrelated matter.

Defendant denied any intention to kill the victim. He also denied having told Joseph Lee that he was going to kill the victim. He admitted having gone to Alonzo

Pickett's to use his file, but in contrast to Pickett's testimony, stated that he borrowed Pickett's tools all he time.

On cross-examination, Defendant stated that during his ten-to-twelve year relationship with the victim, that he had pursued relationships with other women and had even fathered children with other women. He denied being concerned about the victim seeing other men. Defendant admitted that in his statement to police, he did not indicate that the victim had rushed him with the knife and bitten him. In contrast to Lashona's testimony, he also denied having retrieved keys from the victim's purse, instead indicating that he retrieved the keys from the top of a speaker. He did admit to having picked up the fork from the bedroom floor before fleeing the house. He also admitted to prior convictions for selling cocaine.

## I. Sufficiency of the Evidence

In this issue, Defendant challenges the sufficiency of the evidence supporting the jury's verdict in regard to first degree premeditated murder. Defendant contends that the evidence presented at trial supported, at most, a conviction for a lesser offense rather than first degree premeditated murder.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). This standard is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence.

-8-

State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

First degree murder is a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment," and it means that "the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). Furthermore, it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. Tenn. Code Ann. § 39-13-202(d).

The element of premeditation is a question for the jury and "may be established by proof of the circumstances surrounding the killing." State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992)), cert. denied, 118 S. Ct. 1536 (1998); see also State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has identified several factors tending to demonstrate existence of premeditation, including: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42, and State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)); Pike, 978 S.W.2d at 914-15.

Applying the above principles to the instant case, we find that the evidence presented was sufficient to sustain a conviction for first degree premeditated murder. Defendant spoke of killing the victim during the week before the killing, stating that if he could not have her, nobody else would either. He considered procuring a shotgun on the day before the killing, but could not afford to do so. Instead, Defendant took a knife, identified by witnesses as resembling the murder weapon, and sharpened it, stating that he had "to take care of some business." Defendant went to the victim's residence early on a Saturday morning, when only the victim and their two young children were there. Upon entering the home, he watched television with the children for a short time, drank a glass of water, and then proceeded to the victim's bedroom where the victim was still in the bed. Defendant asked the victim to take him to Memphis and the victim told Defendant that she did not feel well. Defendant then began stabbing the victim. He stabbed her on the bed, threw her to the floor, and then continued stabbing her on the floor. When their young daughter

-10-

attempted to stop Defendant, he told her to get out of his way and injured her in the process. Defendant stabbed the victim a total of fourteen times, with some wounds penetrating more than six inches deep. After stabbing the victim, Defendant retrieved keys from her purse and drove away in her car. He then discarded the murder weapon out the window of the car.

After viewing the evidence in a light most favorable to the prosecution, there was more than sufficient evidence for the jury to have found that Defendant intentionally and with premeditation killed the victim. Defendant claimed at trial that he "just clicked" when the victim allegedly attacked him. However, it was for the jury to determine if the Defendant's testimony was persuasive, and by their verdict they obviously did not find it to be. See Pappas, 754 S.W.2d at 623. We find that a rational jury could have indeed reasonably rejected Defendant's version. Accordingly, the evidence was legally sufficient to support Defendant's conviction for first degree premeditated murder beyond a reasonable doubt. This issue is without merit.

## II. Rebuttal Argument

Defendant argues in this issue that the State's rebuttal argument exceeded the proper scope. He contends that the State's rebuttal argument constituted prosecutorial misconduct which requires reversal of his conviction and a remand for a new trial.

In Tennessee, it is well-settled that in reviewing allegations of prosecutorial misconduct, the test to be applied by the appellate court is to ascertain "whether such conduct could have affected the verdict to the prejudice of the defendant." State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990) (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). In Judge, 539 S.W.2d at 344, this Court articulated five factors to be utilized by appellate courts when evaluating claims of prosecutorial misconduct during closing argument. The Tennessee Supreme Court approved of and adopted this five-factor analysis in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). These five factors include: "'(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.'" Id. (quoting Judge, 539 S.W.2d at 344).

In Coker v. State, this Court explained that "[t]rial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper commentary." 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995) (citing Sparks v. State, 563 S.W.2d 564 (Tenn. Crim. App. 1978)). The broad discretion accorded to trial courts in controlling the argument of counsel "will not be reviewed absent abuse of that discretion." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). See also State v. Payton, 782 S.W.2d 490, 496 (Tenn. Crim. App. 1989). Nevertheless, "closing argument 'must be temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried.'" State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978) (citation omitted). Tennessee law does provide that

the State's rebuttal closing argument, which is at issue here, is limited to the subject matter covered in the State's initial closing argument and the defendant's closing argument. Tenn. R. Crim. P. 29.1(b); see also State v. Houston, 688 S.W.2d 838, 841 (Tenn. Crim. App. 1984).

In the case sub judice, the State's initial closing argument focused generally on the elements of the homicide offense and urged the jury that the only valid issue in the case was the degree of that homicide. Defendant then responded that the State had not carried its burden of demonstrating premeditation beyond a reasonable doubt. He then attacked the State's reliance of testimony from witnesses, such as Alonzo Pickett and Ricky Henderson. Finally, he pointed to his own testimony in support of his claim that the evidence showed his behavior was irrational and not premeditated. In rebuttal, that State focused on showing that the testimony of Defendant was simply not credible and pointed out several circumstances which assailed Defendant's credibility. For example, the State pointed out that Defendant had prior convictions. However, the State seemed to primarily focus in rebuttal on the testimony of other credible witnesses, specifically Lashona Davis, whose testimony differed substantially from Defendant's. Defendant objected stating that he had not brought out any specific details about her testimony during his closing argument. Defendant incorrectly argued that the State was limited to the scope of only his closing argument for its rebuttal argument. See Tenn. R. Crim. P. 29.1(b). Regardless, the trial court overruled the objection. The State then continued to question the credibility of Defendant, concluding by pointing out that Defendant had neglected to tell the police much of what he testified to at trial.

We find that the prosector's argument was fair rebuttal to defense counsel's remarks. See Sutton, 562 S.W.2d at 823-24. Accordingly, under the circumstances of this case, we find no reversible error.

Based on all the foregoing, we affirm the judgment of the trial court.


_____
THOMAS T. WOODALL, Judge


CONCUR:


_____
DAVID H. WELLES, Judge


_____
NORMA McGEE OGLE, Judge