# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 14, 2001 Session

## STATE OF TENNESSEE v. MICHAEL J. MCCANN

**Appeal from the Circuit Court for Lewis County**
**No. 5992C    Timothy L. Easter, Judge**

———————————

**No. M2000--2990-CCA-R3-CD - Filed October 17, 2001**

———————————

The Defendant, Michael J. McCann, was convicted by a jury of one count of aggravated criminal trespass on a habitation; two counts of assault; two counts of aggravated assault; one count of aggravated sexual battery; and two counts of especially aggravated kidnapping. After a hearing he was sentenced as a Range II multiple offender on the aggravated assaults, and as a Range I offender on the remaining convictions, to an effective sentence of thirty years. In this appeal as of right, the Defendant contends that his kidnapping convictions must be reversed and dismissed as violative of his due process rights under State v. Anthony; that the trial court erred in not requiring the State to elect between the proof presented in support of two sexual offenses charged; that the Defendant's two assault convictions should have been merged into one of the aggravated assault convictions; that the prosecutor made improper and prejudicial remarks during closing argument; that his sentence is excessive; and that he received ineffective assistance of counsel. We reverse and dismiss one of the Defendant's assault convictions. In all other respects, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and JAMES CURWOOD WITT, JR., JJ., joined.

Joel Kachinsky, Summertown, Tennessee, for the appellant, Michael J. McCann.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Ron Davis, District Attorney General; and Jeffrey L. Long, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The victims Rebekah Guzy and David Williams testified that, at about two a.m. on September 29, 1998, the Defendant, accompanied by Adam Graves and Craig Azcarate, kicked and opened the front door of the house in which the victims were living. Ms. Guzy and Mr. Williams were acquainted with the Defendant, and Mr. Williams had seen the Defendant the previous afternoon in the parking lot of a store. At that time the Defendant asked Mr. Williams what he was doing, and Mr. Williams responded that he was going home, and that he'd be drinking. At the time the Defendant and his cohorts entered the house, Ms. Guzy was in the living room with Carlis Howard; Mr. Williams was in the kitchen; and Jamie Brown was elsewhere in the house. When the Defendant entered the residence, he pointed a revolver at Ms. Guzy; when Mr. Williams started to enter the living room from the kitchen, the Defendant pointed the gun at Mr. Williams. The gun was loaded with three bullets.

The Defendant told Mr. Brown to join them in the living room; he told Mr. Howard and Mr. Brown to sit on the couch. The Defendant demanded money, claiming that Mr. Williams owed him fifty dollars. Ms. Guzy and Mr. Williams protested that they had none and did not owe him any. After repeated demands, the Defendant told Ms. Guzy and Mr. Williams to undress and lie on the floor. When they complied, the Defendant searched their clothes. The Defendant repeatedly pointed the pistol at Ms. Guzy and Mr. Williams as they lay on the floor, at times holding it to their heads. When Mr. Williams raised his head from the floor, Graves slapped him.

At some point the Defendant told Mr. Howard and Mr. Brown that they could leave, and told them not to say anything to anyone. The two men left. The Defendant began stroking Ms. Guzy on her breasts and thighs as she lay naked on the floor, and told her she could "work out" the money. When she refused, the Defendant got her up from the floor and took her into a back bedroom. He gave the pistol to Azcarate and told him to watch Mr. Williams. In the bedroom, the Defendant lowered his pants and again tried to talk Ms. Guzy into having sex with him. When she refused, she testified, he pinned her arms to the bed and raped her. He did not, however, ejaculate, according to Ms. Guzy.

While the Defendant was in the bedroom with Ms. Guzy, Graves and Azcarate stayed with Mr. Williams. At one point they tied his hands and legs with a microphone cord, and Graves and Azcarate stepped out the back door for a short time. When they reentered the house, Mr. Williams had managed to free one of his hands. Azcarate told Mr. Williams to get up and sit on the couch. Mr. Williams complied. Azcarate then took Mr. Williams out onto the back porch, where they remained for a few minutes. They then reentered the house. Azcarate walked down the hall and yelled at the Defendant to "hurry up."

Eventually the Defendant left the bedroom and the four men stood near the back door at the end of the hall. Graves kept telling Mr. Williams to shake his hand. When Mr. Williams extended his hand, Graves hit him in the face. Mr. Williams backed up three steps, and the three other men then attacked him. Mr. Williams fell to the floor and the men kicked him in the body and head. The Defendant kept threatening to kill Mr. Williams. The Defendant told Mr. Williams to get to his knees; when Mr. Williams did so, the Defendant thrust the barrel of the pistol into Mr. Williams' mouth. When Mr. Williams gagged, the Defendant told him that if he threw up, the Defendant would kill him. The attackers dumped flour on Mr. Williams' head, and the Defendant told him he'd be back in fourteen days for his money. The three men then left, and Ms. Guzy and Mr. Williams heard three gunshots a short time later.

Mr. Williams and Ms. Guzy remained in the house for about an hour because Ms. Guzy was afraid to leave. The men had told her during the attack that they had watched the house for some time before coming in. Eventually Mr. Williams and Ms. Guzy drove to Ms. Guzy's mother's house, and Ms. Guzy's mother called the police. Mr. Williams and Ms. Guzy were subsequently treated at the hospital where a rape kit was performed on Ms. Guzy. Mr. Williams was treated for a fractured cheekbone, a fractured jawbone, and crushed sinus cavities.

Testing done on evidence obtained from the rape kit indicated the presence of semen in Ms. Guzy's vaginal tract that had been deposited within twenty-four hours; however, there was not enough sperm present in the sample to conduct DNA testing. Sperm found on Ms. Guzy's underwear matched Mr. William's DNA profile.

The Defendant testified, admitting that he had entered the house and demanded money from Mr. Williams. He acknowledged pointing the gun at Mr. Williams but denied pointing it at Ms. Guzy. He denied telling the victims to disrobe and lie on the floor. He repeatedly denied raping or touching Ms. Guzy in a sexual manner. He stated that he told Ms. Guzy she could leave the living room if she wanted to avoid seeing him "whip" Mr. Williams, and that she then went to a back room. He explained that he later went to the room where Ms. Guzy was to "comfort" her by telling her they weren't going to kill Mr. Williams. The Defendant admitted kicking Mr. Williams once, but denied putting the gun in his mouth. The Defendant admitted firing the pistol three times when he and his cohorts left the house.

For his role in this criminal episode, the Defendant was charged with one count of aggravated rape; four counts of aggravated assault; one count of especially aggravated burglary; one count of aggravated sexual battery; and two counts of especially aggravated kidnapping. The first count of aggravated assault arose out of the Defendant's pointing the pistol at Ms. Guzy and Mr. Williams when he entered their residence. The second charge of aggravated assault arose out of Graves striking Mr. Williams with his fist. The third charge of aggravated assault arose out of the Defendant and his cohorts hitting and kicking Mr. Williams while he was on the floor. The fourth charge of aggravated assault arose out of the Defendant thrusting the barrel of the pistol into Mr. Williams' mouth. At the close of the State's proof, the trial court reduced the second and third charges of aggravated assault to assault, and reduced the charge of especially aggravated burglary to aggravated

burglary. The jury acquitted the Defendant of the aggravated rape charge and found him guilty of the first and fourth charges of aggravated assault, two assaults, one aggravated criminal trespass against a habitation, one aggravated sexual battery, and two especially aggravated kidnappings.

## I. PROPRIETY OF ESPECIALLY AGGRAVATED KIDNAPPING CONVICTIONS

In his first issue, the Defendant contends that his especially aggravated kidnapping convictions cannot stand under the due process analysis set forth in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). In Anthony, our supreme court addressed the issue of "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." Id. at 300. In the subsequent case of State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997), our supreme court set forth a two prong inquiry for the determination of this issue. The first prong requires us to decide "whether the movement or confinement [of the victim] was beyond that necessary to consummate" the accompanying felony. Id. If so, the second prong requires us to decide "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. We note that, in Dixon, our supreme court stated that "any restraint in addition to that which is necessary to consummate [the accompanying felony] may support a separate conviction for kidnapping." Id. (emphasis added).

The Defendant was convicted of two counts of aggravated assault by display of a deadly weapon: one count for pointing a pistol at both victims when he entered the house, and one count for subsequently putting the barrel of the pistol in Mr. Williams' mouth. Aggravated assault is committed when the perpetrator intentionally or knowingly causes another to reasonably fear imminent bodily injury, accomplished with a deadly weapon. See Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(B). The Defendant was also convicted of two counts of assault: one count for Graves hitting Mr. Williams in the face, and one count for the Defendant hitting and kicking him thereafter. Assault is committed when the perpetrator intentionally, knowingly or recklessly causes bodily injury to another. See id. § 39-13-101(a)(1). The Defendant was also convicted of one count of aggravated sexual battery. Aggravated sexual battery is committed when an accused has unlawful sexual contact with a victim where force or coercion is used to accomplish the act and the accused is armed with a weapon. See id. § 39-13-504(a)(1). The Defendant committed aggravated sexual battery upon Ms. Guzy when he stroked her breasts and the inside of her thighs while she lay naked on the living room floor and he continued to hold the pistol. The Defendant was also convicted of two counts of especially aggravated kidnapping by display of a deadly weapon: one count for each victim. The elements of this crime are the knowing removal or confinement of another unlawfully so at to interfere substantially with the other's liberty, accomplished with a deadly weapon. See id. §§ 39-13-302(a), -305(a)(1)

The Defendant argues that his activities constituted a continuous attempted aggravated robbery, and that any detention of the victims was incidental to that offense. However, the Defendant was neither charged with, nor convicted of, attempted aggravated robbery. Accordingly,

we decline his invitation to analyze the Anthony issue on that basis. Rather, we must determine whether his restraint of the victims' liberty was incidental to the accompanying assaults and/or, with respect to Ms. Guzy, the aggravated sexual battery.

We look first to the Defendant's restraint of Mr. Williams. The Defendant's initial aggravated assault upon Mr. Williams consummated upon the Defendant entering the house and pointing his gun at Mr. Williams. He followed this action with ordering Mr. Williams to disrobe and lie naked on the floor. While Mr. Williams was thus immobilized, the Defendant continued to point his gun at him, keeping him restrained on the floor. The restraint continued when the Defendant took Ms. Guzy into the back room, handed the gun to Azcarate, and told Azcarate to watch Mr. Williams. This restraint of the victim was beyond that necessary to commit the initial aggravated assault, and was further not necessary or incidental to the subsequent assaults. Mr. Williams testified that he was kept restrained for approximately thirty minutes while the Defendant had Ms. Guzy in the back room, and the subsequent assaults did not occur until after the Defendant had returned to the main part of the house. Thus, we turn to the second prong of the Dixon analysis: did the confinement prevent Mr. Williams from summoning help; lessen the Defendant's risk of detection; or create a significant danger or increase Mr. Williams' risk of harm? We have no trouble concluding that forcing someone to lie naked on the floor at gunpoint both reduces the ability to summon help and increases that person's risk of harm, simply because such a position makes the person an easier target to shoot and maim or kill. It is much more difficult to take evasive action while lying on the floor than while standing or even sitting. Likewise, Mr. Williams' ability to summon help was decreased and his risk of harm was increased when he was tied up. Accordingly, we hold that the Defendant's especially aggravated kidnapping of Mr. Williams was not incidental to any of the accompanying assaults upon him.

We turn now to the confinement of Ms. Guzy. Again, the Defendant had already committed his initial aggravated assault prior to ordering Ms. Guzy to undress and like naked on the floor. This restraint was therefore not incidental to the aggravated assault upon her. Nor, in our opinion, was it incidental to the aggravated sexual battery that commenced after the Defendant had ordered her to disrobe and lie on the floor. The proof at trial indicated that the Defendant ordered the victims to undress so that he could search their clothes for money after they told him that they didn't have any. He continued to hold them at gunpoint for some period of time while he repeated his demands for money. He did not begin committing the aggravated sexual battery upon Ms. Guzy until it became clear that he was not going to get any money, and he decided that he could get his money's worth by Ms. Guzy "working it out" with him. Thus, there was some period of time during which the Defendant restrained Ms. Guzy at gunpoint which was not incidental to either the initial aggravated assault, or to the subsequent aggravated sexual battery.

Thus, we consider the second prong of the Dixon analysis: did the Defendant's confinement of Ms. Guzy on the living room floor prevent her from summoning help, lessen the Defendant's risk of detection, or increase her risk of harm? For the same reasons set forth above with respect to Mr. Williams, we find that the Defendant's actions in restraining Ms. Guzy both prevented her from summoning help and increased her risk of harm. The restraint therefore supports a separate

conviction for the especially aggravated kidnapping of Ms. Guzy. Accordingly, we hold that the Defendant's convictions for especially aggravated kidnapping do not violate his due process rights under Anthony and this issue is therefore without merit.

## II. ELECTION OF OFFENSES

In his next issue the Defendant contends that the trial court erred by not requiring the State to elect which proof it was relying on in support of the aggravated sexual battery charge. He contends that some members of the jury may have convicted him of aggravated sexual battery based upon his touching Ms. Guzy in the living room, and some of them may have convicted him of the crime based on his conduct in the bedroom, thereby violating his constitutional right to a unanimous verdict. See Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973) (finding that the right to a unanimous jury verdict is "fundamental, immediately touching the constitutional rights of an accused"). The State responds that it elected the offense upon which it was relying during its closing argument.[1]

In this case the State submitted proof of two episodes of conduct which would have supported a conviction for aggravated sexual battery: when the Defendant touched Ms. Guzy's breasts and thighs as she lay naked on the living room floor while he held a pistol, and when he later pinned her to the bed in the back room and, according to Ms. Guzy's testimony, engaged in intercourse. See Tenn. Code Ann. § 39-13-504(a)(1), (a)(3)(A). Where the proof at trial indicates that the defendant has committed multiple instances of the charged crime against the victim, the prosecution must elect the particular instance for which the conviction is sought. See State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001) (quoting State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1991)). "The paramount importance of the election requirement is that it protects a defendant's right to a unanimous jury verdict under the Tennessee Constitution by ensuring that jurors deliberate over and render a verdict based on the same offense." Id. Accordingly, when the prosecution offers evidence of multiple discrete acts, each of which would support a conviction of the charged offense, the trial court should require the prosecution to elect which proof it is relying upon in seeking the conviction. See Burlison, 501 S.W.2d at 804. In this case, the trial court failed to do so.

Nevertheless, during his summation, the prosecutor did, in effect, elect which proof he was relying upon in support of the aggravated sexual battery charge. At the beginning of his closing argument, the prosecutor summarized each of the counts against the Defendant. With respect to the aggravated sexual battery charge, the prosecutor stated, "Count 7, aggravated sexual battery, fondling Rebekah on the floor in the front room while she was naked." This Court has previously held that a prosecutor's closing argument may effectively serve as an election of offenses. See State v. William Dearry, No. 03C01-9612-CC-00462, 1998 WL 47946, at *13 (Tenn. Crim. App., Knoxville, Feb. 6, 1998). We find an effective election of offenses in this case, as well. Accordingly, this issue is without merit.

---

[1] The State also contends that the Defendant has waived this issue by failing to include it in his motion for new trial. See Tenn. R .App. P. 3(e). Nevertheless, we choose to address this issue on its merits.

### III. MERGER OF ASSAULT CONVICTIONS

In his next issue the Defendant contends that his two convictions for simple assault should have been merged with his conviction for the aggravated assault arising from his placing the pistol in Mr. Williams' mouth. The Defendant contends that Graves's hitting Mr. Williams in the face; the subsequent kicking of Mr. Williams by each of the three men; and the placing of the gun in Mr. Williams' mouth "was one continuing assault" and that the three convictions are therefore multiplicitous. See State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996) ("Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense.") The State disagrees.[2]

Multiple convictions and/or punishments for the same offense violate the federal and state constitutional prohibitions against double jeopardy. See U.S. Const. amend. V; Tenn. Const. Art. I, § 10. In State v. Denton, 938 S.W.2d 373 (Tenn. 1996), our supreme court established a framework for determining whether a defendant has received multiple punishments for the "same offense." The reviewing court must consider (1) the statutory elements of the offenses, (2) the evidence used to prove the offenses, (3) whether there were multiple victims or discrete acts, and (4) the purposes of the respective statutes. Id. at 381.

We agree with the Defendant that the two convictions of assault should be merged into a single conviction. A defendant can commit assault in any of three ways: by intentionally, knowingly or recklessly causing bodily injury to the victim; by intentionally or knowingly causing the victim to reasonably fear imminent bodily injury; or by intentionally or knowingly causing physical contact with the victim that a reasonable person would regard as extremely offensive or provocative. See Tenn. Code Ann. § 39-13-101(a). In this case, both of the assaults with which the Defendant was charged were based on the Defendant's causing bodily injury to Mr. Williams. Both charges arose out of a short period of time during which one of the perpetrators struck Mr. Williams in the face, followed by all three perpetrators kicking Mr. Williams when he subsequently fell to the floor. That is, both convictions arose out of a single attack. In State v. Pelayo, 881 S.W.2d 7 (Tenn. Crim. App. 1994), the defendant attacked the victim in her residence with a knife, cutting her arm. When she tried to flee, the defendant chased the victim outside and there cut her on the leg. The defendant was convicted of two counts of aggravated assault. This Court reversed and set aside one of the convictions on double jeopardy grounds, finding that the multiple stab wounds arose out of a single act. Id. at 13. In setting aside one of the convictions, this Court noted, "we find nothing in the [aggravated assault] statute to indicate that the legislature intended for defendants to be punished separately for each blow or injury." Id. We think the Pelayo analysis applies to the Defendant's dual assault convictions. Accordingly, we reverse his conviction of assault based on Count 3 of the indictment and dismiss that charge.

---

[2]The State also contends that the Defendant has waived this issue for failure to raise it in his motion for new trial. Nevertheless, we choose to address this issue on the merits. See Tenn. R. Crim. P. 52(b); State v. Epps, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998) (applying the plain error doctrine to address whether the defendant's dual convictions violated double jeopardy principles, even where the defendant failed to raise the issue in the trial court.)

We find, however, that the remaining assault conviction need not be merged into the aggravated assault conviction. Applying the Denton analysis, we first note that each of these offenses required an element that the other one did not. That is, the assault (as charged in this case) required proof of bodily injury, whereas the aggravated assault (as charged in this case) did not. The aggravated assault, on the other hand, required the use or display of a deadly weapon; the assault did not. This initial determination therefore indicates that the two offenses should not be considered one for double jeopardy purposes.

Next, we consider the evidence used to prove the offenses. Clearly, the evidence relied upon by the State to prove the assaults was different than that used to prove the aggravated assault. The assaults were based on the attackers' hitting and kicking Mr. Williams; the aggravated assault was based upon the Defendant sticking a gun barrel in Mr. Williams' mouth. This factor, too, supports separate offenses. Similarly, the offenses were committed by discrete acts: a third factor weighing in favor of two different crimes.

Finally, a comparison of the purposes of the respective statutes reveals that both statutes are aimed at prohibiting behavior which causes injury and/or fear of imminent injury. However, the portions of the statutes charged in this case are aimed at different evils: attacking a fellow human being with only one's hands (or feet), and attacking a fellow human being with a deadly weapon. The potential levels of harm inherent in each of these forms of attack are, generally speaking, vastly different. We have no trouble concluding, then, that the legislature intended that a defendant who uses both of these levels of attack, even on a single victim during a single episode, should be subject to separate convictions and separate punishments. Accordingly, we find without merit the Defendant's contention that his convictions for assault and aggravated assault should be merged.

### IV. IMPROPER SUMMATION BY STATE

In his next issue the Defendant contends that the trial court should have granted him a mistrial, or at least have issued a curative instruction, following a portion of the prosecutor's closing argument. We agree with the State that the Defendant has waived this issue because he did not object at the time that the prosecutor made the allegedly improper remarks. See Tenn. R. App. P. 36(a); State v. Smith, 42 S.W.3d 101, 112 (Tenn. Crim. App. 2000). Moreover, the Defendant's contentions fail on the merits.

During his summation, defense counsel argued that Graves and Azcarate were treated more favorably by the State in the prosecution of these crimes than was the Defendant. Azcarate testified at trial that he had pled guilty to especially aggravated burglary and aggravated assault in connection with the attack on the victims, and received an effective sentence of thirteen years. The State dismissed the charges against him for aggravated rape, three additional counts of aggravated assault, aggravated sexual battery, and two counts of especially aggravated kidnapping. Graves testified that he was facing the same charges as was the Defendant, but had not yet gone to trial or otherwise resolved these charges. In response to the Defendant's argument, the prosecutor stated:

> And he talks about all this unequalness, about Mike McCann being
> singled out. Who was the leader of this enterprise? Who had the gun

when they came into the house?  Who told the other two to go to the residence to begin with?  Who kicked the door open?  Who gave the orders to undress?  Who fondled Rebekah?  Who ordered her to the back room?  Who forced her legs open, climbed on top of her, held her arms back and raped her?  Who said he'd be back?  Who said to get down because he'd fire shots?  Who fired the shots?  By his own admission, who ordered the other two to untie David?  Who was in control?  Who had seven convictions already?  It's time for his time of [sic] reign and [sic] terror to end, and I ask you to end it today.

It is the latter two sentences about which the Defendant complains.

Trial courts have substantial discretionary authority in determining the propriety of final argument, and although counsel is generally given wide latitude, trial judges must restrict any improper commentary.  See Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995).  Closing arguments must be temperate, must be based upon evidence introduced during trial, and must be relevant to the issues at trial.  See State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978).  The State should refrain from argument designed to inflame or incite the emotions of the jury.  See Coker, 911 S.W.2d at 368.

When a prosecutor makes improper comments during closing argument, we must determine "whether the impropriety 'affected the verdict to the prejudice of the defendant.'"  State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994) (quoting Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)).  The factors to aid us in making this determination include:
> (1) the conduct complained of viewed in light of the facts and circumstances of the case;
> (2) the curative measures undertaken by the court and the prosecution;
> (3) the intent of the prosecutor in making the improper arguments;
> (4) the cumulative effect of the improper conduct and any other errors in the record; and
> (5) the relative strength and weakness of the case.

Id. (quoting State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984)).  Furthermore, because the Defendant waived this issue at trial, this Court will not grant relief on this issue unless the alleged prosecutorial misconduct rises to the level of "plain error," affecting a "substantial right" of the accused.  See Tenn. R. Crim. P. 52(b); State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994).

In this case, the prosecutor's reference to the Defendant's prior convictions followed by an entreaty that the jury end his "reign of terror" was improper argument.  The Defendant's prior convictions had been admitted at trial for impeachment purposes only:  not as substantive evidence that he had a bad character, or as proof that he deserved to be convicted of the present charges.  The trial court should have issued a curative instruction sua sponte, but failed to do so.  Nevertheless, we

do not think that this portion of the State's argument was so inappropriate as to have affected the jury's verdict to the Defendant's prejudice. The jury acquitted the Defendant of aggravated rape, one of the most serious charges he faced, and convicted him of a lesser included offense of the charge of aggravated burglary. Clearly, the jury was not determined to convict the Defendant at all costs. The State's case against the Defendant was strong, including testimony by both of his codefendants. Although not raised on appeal, the evidence was more than sufficient to support the Defendant's convictions in this case. The cumulative effect of the improper argument and other errors in the record is simply not so prejudicial as to require this Court to set aside the jury's verdict. This issue is without merit.

## V. SENTENCING

The Defendant complains about his sentence, contending that the trial court erred in classifying him as a Range II multiple offender with respect to two of his convictions, and in refusing to apply any mitigating factors. The Defendant further contends that the trial court erred in ordering partially consecutive sentences.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). It is the Defendant's burden to demonstrate that his sentence is improper. Id.

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Brewer, 875 S.W.2d 298, 302 (Tenn. Crim. App. 1993); State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

At the sentencing hearing the State introduced the presentence report and queried the Defendant about his prior convictions.[3] The Defendant admitted to having committed the four prior felonies listed. The trial court, prosecutor and defense counsel each questioned the Defendant about whether the four prior felonies had been committed on different days, as the presentence report was unclear: two of the felonies list the date of event and the date of conviction as the same. The remaining two felonies (sales of marijuana) list event dates of August 14, 1993 and September 10, 1993, with conviction dates of February 21, 1994. When asked by the trial court whether the two event dates for these two felonies were correct, the Defendant replied, "They seem correct, yes, sir." The Defendant subsequently testified that he couldn't specifically remember whether the marijuana offenses occurred on different dates.

The trial court determined the Defendant to be a Range II multiple offender for purposes of sentencing him on the aggravated assault convictions. A defendant may be sentenced as a multiple offender if he or she has received a "minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes, where applicable." Tenn. Code Ann. § 40-35-106(a)(1). Aggravated assaults of the type committed by the Defendant are Class C felonies. See id. § 39-13-102(d). The Defendant's marijuana convictions are Class E felonies. See id. § 39-17-417(g)(1). Thus, the Defendant's prior felonies render him eligible for multiple offender status as to the aggravated assault convictions.[4]

However, to be considered separate "prior felony convictions," the marijuana sales could not have been committed "as part of a single course of conduct within twenty-four (24) hours." Id. § 40-35-106(b)(4). This is the reason for the trial court's concern in determining whether the Defendant's sales of marijuana occurred on different days.

The trial court concluded that the Defendant's prior felonies arose from events occurring on different days, in spite of some conflicting testimony from the Defendant. The Defendant now asks us to second-guess the trial court's finding of fact with respect to this issue. We decline to do so. The trial court had not only the Defendant's own testimony on which to base its decision, but the presentence report, as well. As this court has previously noted, a presentence report is reliable hearsay. See State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997). The presentence report in this case indicates two different event dates for the two prior felony convictions at issue. Thus, we hold that the evidence, while not without some ambiguity, is sufficient to support the trial court's determination that the Defendant is, beyond a reasonable doubt, a multiple offender with respect to the aggravated assault convictions. Accordingly, this issue is without merit.

---

[3]The presentence report lists the following prior convictions: three thefts up to $500; criminal trespassing; assault; felony burglary of auto; three felony sales of marijuana; contributing to the delinquency of a minor; misdemeanor escape; and misdemeanor stalking.

[4]The Defendant is not eligible for multiple offender status on the especially aggravated kidnapping or the aggravated sexual battery convictions, because those are Class A and Class B felonies, respectively. See Tenn. Code Ann. § 39-13-305(b)(1), -504(b). The Class E prior felonies are not within the next two lower felony classes of these felonies and therefore do not qualify the Defendant as a multiple offender with respect to these convictions.

In sentencing the Defendant for the aggravated assault convictions, the trial court determined that three enhancement factors applied: the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; the Defendant was a leader in the commission of an offense involving two or more criminal actors; and the crimes were committed while the Defendant was on release status from a prior felony conviction. See Tenn. Code Ann. § 40-35-114(1), (2), (13). The trial court found that no mitigating factors applied. Accordingly, the trial court sentenced the Defendant to the maximum term of ten years on each of the aggravated assault convictions.[5] The trial court applied the same enhancement factors to the especially aggravated kidnapping convictions, Class A felonies,[6] and again applied no mitigating factors. Accordingly, the trial court sentenced the Defendant to the maximum term of twenty-five years[7] on each of these convictions. The trial court applied the first and third of these three enhancement factors, and no mitigating factors, to the aggravated sexual battery conviction, a Class B felony.[8] Accordingly, the trial court sentenced the Defendant to a mid-range term of ten years[9] on this conviction.[10]

The Defendant does not challenge the trial court's application of the enhancement factors; rather he complains that the trial court erred in failing to apply two mitigating factors. The Defendant asserts that the trial court should have mitigated his sentences on the basis that the Defendant, who was twenty-four years old at the time he committed these offenses, lacked substantial judgment in committing the crimes because of his youth. See id. § 40-35-113(6). He also asserts that, as to his especially aggravated kidnapping convictions, the trial court should have considered as a mitigating factor that he voluntarily released the victims alive. See id. § 39-13-305(b)(2).

The record simply does not support a finding that the Defendant, because of his "youth," lacked substantial judgment in committing these crimes. This issue is without merit. However, we agree with the Defendant that the trial court should have considered in mitigation of the Defendant's sentences on the especially aggravated kidnapping convictions, that he voluntarily released the victims alive. The especially aggravated kidnapping statute mandates consideration of this factor in sentencing. See id. We note, though, that the Sentencing Commission Comments to this

---

[5]The Range II sentence for a Class C felony is six to ten years. See Tenn. Code Ann. § 40-35-112(b)(3).

[6]See Tenn. Code Ann. § 39-13-305(b)(1).

[7]The Range I sentence for a Class A felony is fifteen to twenty-five years. See Tenn. Code Ann. § 40-35-112(a)(1).

[8]See Tenn. Code Ann. § 39-13-504(b).

[9]The Range I sentence for a Class B felony is eight to twelve years. See Tenn. Code Ann. § 40-35-112(a)(2).

[10]On each of the Defendant's remaining misdemeanor convictions for assault and aggravated criminal trespass on a habitation, the trial court sentenced the Defendant to eleven months, twenty-nine days at seventy-five percent, to be served concurrently. The Defendant does not complain about these sentences.

-12-

provision state that the court is required to consider "the voluntary <u>safe</u> release of the victim" (emphasis added). Here, the proof established that both victims suffered physical and/or psychological injuries from the crimes committed in conjunction with the kidnappings, which required treatment following their release. Thus, although marginally applicable, we do not believe that this mitigating factor would have been entitled to much, if any, weight. <u>See</u> <u>State v. Winford Lee Pipkin</u>, No. 01C01-9605-CR-00210, 1997 WL 749430, at *8 (Tenn. Crim. App., Nashville, Dec. 4, 1997) (finding factor entitled to little, if any, weight where victim raped five times during course of kidnapping and victim "suffered in several ways following the commission of the criminal acts.") Accordingly, the Defendant is entitled to no reduction in his sentences on the especially aggravated kidnappings on the basis of this mitigating factor.

Finally, the Defendant contends that the trial court erred in ordering his sentences for the two aggravated assaults and the aggravated sexual battery to run consecutively to each other, for an effective sentence of thirty years. The trial court ordered partial consecutive sentencing on the basis that the Defendant is an offender whose record of criminal activity is extensive, and that he is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. <u>See</u> Tenn. Code Ann. § 40-35-115(b)(2), (4). With respect to finding the Defendant a dangerous offender, the trial court further found that an extended sentence was necessary to protect the public against further criminal activity by the Defendant, and that the length of his sentence was reasonably related to the severity of the crimes he committed. <u>See</u> <u>State v. Wilkerson</u>, 905 S.W.2d 933, 939 (Tenn. 1995).

The Defendant contends that his consecutive sentences cannot be justified "[c]onsidering the nonviolent nature of [his] previous crimes and the disparity of the length of [his] sentence compared to the sentences of his [c]odefendants." We respectfully disagree. Including the convictions arising from his attack on Ms. Guzy and Mr. Williams, the Defendant has already committed nineteen crimes for which he has been convicted. While we agree with the Defendant that most of his prior crimes were nonviolent, the instant attack makes clear that the Defendant has "graduated" to violent crimes made even more dangerous by the use of a deadly weapon. The record supports the trial court's determination that the Defendant is an offender whose record of criminal activity is extensive, and this factor alone is sufficient to support consecutive sentencing. <u>See</u> Tenn. Code Ann. § 40-35-115(b).

We also agree with the trial court that the Defendant is a dangerous offender within the meaning of the consecutive sentencing statute. He committed these crimes with a loaded pistol and two cohorts in a manner that made it virtually impossible for the victims to escape or obtain help. They were literally at the Defendant's mercy while he attacked them in their own house in the middle of the night and held them captive at gunpoint. When the Defendant did not get the money he demanded, he resorted to physically assaulting Mr. Williams and sexually assaulting Ms. Guzy. Moreover, the Defendant committed the instant crimes while on release status: making clear that he cannot be trusted to restrain himself while at large. The Defendant's acts were reprehensible and society must be protected from further attacks of this nature. The effective length of the Defendant's sentence is "justly deserved in relation to the seriousness of the offense[s]" and "no greater than that

deserved" under the circumstances. See id. §§ 40-35-102(1), -103(2); State v. Lane, 3 S.W.3d 456, 460 (Tenn. 1999). Accordingly, we find no error in the trial court's ordering partial consecutive sentences for the Defendant, and this issue is therefore without merit.

With respect to Graves' and Azcarate's sentences, Azcarate testified that he pled guilty to aggravated assault and especially aggravated burglary, receiving sentences as a Range I standard offender of three years and ten years incarceration, respectively. The record also contains a copy of the judgments entered against Azcarate, indicating that the sentences were ordered to run consecutively for an effective term of thirteen years. Additionally, pursuant to the Defendant's motion for consideration of post-judgment facts, the Defendant filed with this Court a copy of judgments entered against Graves, indicating that he pled guilty to aggravated assault and especially aggravated burglary and was sentenced as a Range I standard offender to three and nine years, respectively, with the sentences to run concurrently.

We acknowledge that one of the purposes of the Criminal Sentencing Reform Act of 1989 is to eliminate "unjustified disparity in sentencing." See Tenn. Code Ann. § 40-35-102(2); State v. Juan Jerome Bryant, No. 01C01-9805-CR-00217, 1999 WL 308649, at *5 (Tenn. Crim. App., Nashville, May 18, 1999). The Defendant has failed to demonstrate, however, how the differences between his sentences and those of his codefendants are "unjustified." There is nothing in the record to inform this Court about the proof presented at the codefendants' sentencing hearings, or about the findings of fact underlying the sentencing courts' determinations. Moreover, the Defendant's role in these crimes was significantly greater than that of Graves or Azcarate. Based on the information before us, we decline to find that the Defendant is entitled to have his sentences reduced on the basis of the sentences his codefendants received. This issue is without merit.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, the Defendant complains that he received ineffective assistance of counsel at trial. However, the Defendant failed to raise this issue in his motion for new trial. Accordingly, this issue is waived on direct appeal. See Tenn. R. App. P. 3(e); State v. Slater Belcher, No. 03C01-9608-CC-00299, 1997 WL 749392, at *6 (Tenn. Crim. App., Knoxville, Nov. 26, 1997). "Moreover, we have previously warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." Kendricks v. State, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). To be successful on a claim of ineffective assistance of counsel, a defendant must prove by clear and convincing evidence that his counsel's performance was deficient in some way, and that the deficient performance actually prejudiced the defense. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). Here, the Defendant failed to raise the issue in his motion for new trial and was therefore in no position to present proof of his lawyer's performance at the hearing on that motion. Given that we have no findings of fact from the trial court before us on this issue, it is inappropriate for us to consider the issue. See Belcher, 1997 WL 749392, at *6. However, the Defendant may raise this issue in an appropriate post-conviction proceeding if he is so inclined. Id.

## CONCLUSION

The Defendant's conviction for assault on Count 3 of the indictment is reversed and the judgment imposing sentence thereon is vacated. In all other respects, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE