IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 5, 2009 Session

**STATE OF TENNESSEE v. KEVIN MCDOUGLE**

Direct Appeal from the Criminal Court for Shelby County
No. 06-04210      W. Mark Ward, Judge

No. W2007-02344-CCA-R3-CD  - Filed February 10, 2010

Following a jury trial, Defendant, Kevin McDougle, was convicted of aggravated robbery, a Class B felony, in case no. 06-04210.  The trial court sentenced Defendant as a Range I, standard offender, to twelve years.  The trial court ordered Defendant to serve his sentence in case no. 06-04210 consecutively to his effective sentence of thirty-two years in case nos. 06-04209 and 07-01739, for an effective sentence of forty-four years.  On appeal, Defendant argues that (1) the prosecutor committed prosecutorial misconduct during the cross-examination of a witness for the defense; (2) the trial court erred in imposing consecutive sentencing; and (3) the imposition of consecutive sentencing violates his Sixth Amendment right to a jury trial.  After a thorough review, we affirm the judgment of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which J. C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee (on appeal) and Stephanie Calvert, Memphis, Tennessee (at trial) for the appellant, Kevin McDougle.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; Dean DeCandia, Assistant District Attorney General; and Scot Bearup, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Although Defendant does not challenge the sufficiency of the convicting evidence, we will briefly review the evidence supporting Defendant's conviction of aggravated robbery. Ricky Love testified that he drove to the cleaners on October 15, 2005, at approximately 3:45 p.m. Mr. Love parked in front of the establishment, went inside to drop off some clothes, and then returned to his vehicle, a red 2004 Dodge Intrepid. As Mr. Love approached his vehicle, he noticed Defendant standing approximately ten feet from the Dodge. After Mr. Love got into his vehicle, Defendant walked up and asked Mr. Love for a lighter. Defendant lit a cigarette and then handed the lighter back to Mr. Love. Mr. Love put the lighter away. When Mr. Love looked up again, Defendant was pointing a gun at his head. Defendant ordered Mr. Love to empty his pockets, and Mr. Love gave Defendant the money from his pocket. Defendant told Mr. Love to get out of the vehicle and warned him to "stand back" and not run. Mr. Love stated that Defendant got into the Dodge, searched through the interior of the vehicle, and then drove off.

Mr. Love returned to the cleaners and called 911. On October 19, 2005, Mr. Love identified Defendant as the perpetrator of the offense from a photographic line-up. Mr. Love's vehicle was later discovered in the possession of Darnell Wallace. Mr. Love said that Mr. Wallace's photograph was included in the photographic line-up from which he identified Defendant. Mr. Love attended a preliminary hearing in general sessions court and confirmed that Mr. Wallace was not the person who took his vehicle.

Deangelo Richard testified that he had known Mr. Wallace and Michael Smith for approximately eight years. Mr. Richard said that he occasionally ran into Defendant because Defendant's mother dated Mr. Richard's uncle. Mr. Richard stated that in October 2005, he saw Defendant driving a red Dodge Intrepid. No one else was in the vehicle. Defendant stopped, got out of the vehicle, and asked Mr. Richard if he wanted to buy the Dodge. Mr. Richard at first declined, then he took the car keys and decided to drive the vehicle. Mr. Richard later changed his mind about purchasing the vehicle and returned the Dodge to Defendant. Defendant drove off. Mr. Richard said that he saw the red Dodge approximately thirty to forty-five minutes later. A patrol car was parked near the Dodge, and Mr. Wallace, Mr. Smith, and Mr. Richard's girlfriend, Lashandra Wallace, were sitting inside the patrol car.

David Arocho, an officer with the Memphis Police Department, was dispatched to the location of the recovered Dodge Intrepid on October 18, 2005. Officer Arocho was informed

that the driver of the vehicle had fled into a nearby abandoned house. Officer Arocho testified that he searched the house and discovered Mr. Wallace hiding in a closet.

Francis Donald Carpenter, a fingerprint technician with the Memphis Police Department, processed the red Dodge Intrepid for fingerprints. Officer Carpenter stated that Mr. Love was the registered owner of the vehicle. Officer Carpenter recovered latent prints from the left rear fender, the right rear fender, and the driver's inside rear view mirror. Martin Milner, a latent fingerprint examiner for the Memphis Police Department, testified that the fingerprint found on the Intrepid's inside rear view mirror matched a set of known prints from Defendant contained in Records and Identification File No. 283458. The print lifted from the right front fender matched a set of known prints from Mr. Richard. Officer Milner stated that he was unable to match the fingerprint found on the Intrepid's left front fender. Linda Raper, a certified fingerprint examiner with the Shelby County Sheriff's Department, testified that she confirmed that Defendant's fingerprints matched those contained in Records & Identification File No. 283458.

The State rested its case-in-chief, and Defendant presented his defense. Darnell Deangelo Wallace testified that on October 18, 2005, he was driving a red Dodge Intrepid when he was pulled over by police officers. Michael Smith and Lashandra Wallace were also in the vehicle. Mr. Wallace stated that he first saw the Intrepid earlier that day at a grocery store, and Defendant was in the vehicle by himself. Mr. Wallace said that Defendant later let him drive the Intrepid to work. Mr. Wallace stated that he did not know Defendant's name, but simply called him "Crip dude." The investigating officers showed Mr. Wallace Defendant's photograph, and Mr. Wallace identified Defendant as the man he knew as "Crip dude." On cross-examination, Mr. Wallace acknowledged that his and Mr. Smith's photographs were included in the photographic line-up shown to Mr. Love, and Mr. Love identified Defendant as the perpetrator.

Defendant called Deputy Wright, a bailiff with the Shelby county Criminal Court, for the purpose of measuring Defendant. (Deputy Wright's first name was not provided for the record). Mr. Love had testified on direct examination that Defendant was between five feet, nine inches, and six feet tall. Deputy Wright measured Defendant in the courtroom and determined that Defendant was seventy-four and one-half inches tall, which is six feet, two and one-half inches.

## II. Prosecutorial Misconduct

Defendant argues that the prosecutor improperly cross-examined Deputy Wright concerning certain gestures Defendant was reported to have made during Mr. Wallace's

testimony. At trial, the following colloquy occurred during Deputy Wright's cross-examination:

[THE STATE]:          You were present for the testimony yesterday, weren't you?

[DEPUTY WRIGHT]:      Yes.

[THE STATE]:          Do you recall the victim, Ricky Love, stating that the robber was, in fact, taller than he was?

[DEPUTY WRIGHT]:      Yes.

[THE STATE]:          Were you in the Courtroom during Darnell Wallace's testimony?

[DEPUTY WRIGHT]:      Yes.

[THE STATE]:          Do you recall seeing the Defendant making these gestures (indicating) at Darnell Wallace when he was testifying?

Defense counsel immediately objected to the relevance of the question, and the trial court conducted a hearing out of the presence of the jury. In response to the trial court's questions, Deputy Wright stated that he did not see Defendant make any gestures, although he heard from others that Defendant had done so. The prosecutor explained that he had a good faith basis for the question because certain persons present in the courtroom had reported to him that Defendant was making "shooting" gestures at Mr. Wallace with his hand. The trial court observed that it could not say that the question was irrelevant, but stated, "I sure wish you'd have given me some heads up." However, in light of Deputy Wallace's response during the offer of proof, the trial court offered defense counsel the option of excluding the question or allowing Deputy Wright to answer the State's question. Defendant chose the latter option. The jury returned to the courtroom and the following occurred:

[THE COURT]:          All right, ladies and gentlemen, I believe when you stepped out, the Prosecutor had asked a question, something to the effect of whether or not this witness had seen some kind of gesture made by the Defendant, and I think we stopped

-4-

there. What would your answer to that question have been?

[DEPUTY WRIGHT]:  No.

On redirect examination, the following colloquy occurred:

[DEFENSE COUNSEL]:  Deputy Wright, [the prosecutor] has asked you if you had seen a certain gesture. If you had seen any threatening behavior or any sort of gesture, as . . . [the prosecutor] suggested, would you have informed the Court or somehow reacted to that?

[DEPUTY WRIGHT]:  Yes. I would have stopped Court and told the Judge what happened.

In reviewing allegations of prosecutorial misconduct, this court looks to see "whether such conduct could have affected the verdict to the prejudice of the defendant." State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). That analysis involves consideration of five factors:

"(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). Whether the trial court erred in allowing the challenged conduct is reviewed for abuse of discretion. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1972).

Rule 611 of the Tennessee Rules of Evidence provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b). The propriety, scope, manner, and control of the examination of witnesses are within the sound discretion of the trial court. State v. Humphreys, 70 S.W.3d 752, 766-67 (Tenn. Crim. App. 2001).

In this instance, there was some basis for the prosecutor's question. The prosecutor received information that Defendant had made a shooting gesture at Mr. Wallace with his

hand while Mr. Wallace was testifying. Under certain circumstances, this Court has concluded that a defendant's threatening gestures to a testifying witness which visibly affects the witness's demeanor is relevant to the jury in assessing the witness's credibility. See e.g. State v. Mickens, 123 S.W.3d 355, 382 (Tenn. Crim. App. 2003). Based on our review of the record, we cannot say that the prosecutor in the instant case was improperly motivated in posing the question.

Moreover, the exchange between Deputy Wright and the prosecutor was brief, and Deputy Wright testified that he did not see Defendant make any gestures. On redirect examination, Deputy Wright said that if he had, he would "have stopped Court and told the Judge what happened." The trial court promptly informed the jury that:

> [s]tatements, arguments and remarks of counsel – that's lawyers – are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence you should disregard them. The questions the lawyers ask the witnesses are not evidence. You should not think that something is true just because one of the lawyers asks questions that assume or suggest that it is true.

Viewing the record as a whole and the relative strength of the State's case, we conclude that the question, even if improper, did not affect the verdict to Defendant's detriment. Defendant is not entitled to relief on this issue.

## III. Sixth Amendment Challenge

Defendant argues that the imposition of consecutive sentencing under the Sentencing Act of 1989 violates his Sixth Amendment right to a jury trial. Defendant acknowledges that at the time this matter was on appeal, our supreme court had rejected this argument. State v. Allen, 259 S.W.3d 671 (Tenn. 2008). In Allen, our supreme court held that:

> [t]he decision whether to impose consecutive sentences for multiple crimes is a decision about the manner in which a defendant serves his or her multiple punishments. Whether or not to "stack" sentences for multiple crimes is therefore akin to a trial court's decision as to how and where a defendant serves his sentences: on probation, on community corrections, in split confinement, or in the penitentiary. Apprendi and Blakely simply do not require the jury to determine the manner in which a defendant serves multiple sentences. That Tennessee's statutes require (in most instances) trial courts to make specific factual findings before imposing consecutive sentences does not extend the reach of Apprendi and Blakely.

Allen, 259 S.W.3d at 689 -690 (Tenn. 2008).  On January 14, 2009, after the submission of Defendant's brief, the United States Supreme Court concluded that a defendant's constitutional right to trial by jury is not implicated by sentencing structures, such as Tennessee's, which require the trial court "to make certain predicate fact findings" before imposing consecutive sentencing. Oregon v. Ice, ___ U.S. ___, 129 S. Ct. 711, 715 n.3, 716-720 (2009).  Thus, Defendant is not entitled to relief pursuant to this particular argument.

## IV.  Imposition of Consecutive Sentencing

At the beginning of the sentencing hearing, Defendant waived his right to be present, and the hearing was conducted in his absence.  The State relied on the presentence report which was introduced as an exhibit.  Defendant did not offer any evidence at the hearing. According to the presentence report, Defendant was twenty-one years old when he committed the current offense.  Defendant reported dropping out of school in the eighth grade and did not list any employment.  Defendant was first placed in the custody of the Department of Children's Services ("DCS") in 1997 when he was thirteen years old.  He was subsequently placed in several different facilities before his eighteenth birthday after engaging in violent behavior toward his peers and the staff at the facility in which he was residing.

Defendant reported in the presentence report that he suffers from bipolar disorder and was treated at the Western Mental Health Institute (the "Institute").  According to the evaluations attached as an exhibit to the presentence report, Defendant was referred to the Institute by DCS for evaluation in November 1999, following a display of disruptive and aggressive behavior at the facility in which he was then residing.  Testing revealed that Defendant had a composite IQ score of 83, and the evaluating team did not detect any sign of mental retardation or psychopathologic disorders.  The team concluded that Defendant should be returned to the facility "where he can learn to be responsible for his decisions, attitudes and behavior and learn to take the consequences of the same.  While he may injure others by fighting or attempting to get even, it is by choice and not because of mental illness."

In 2001, Defendant was again admitted to the Institute from the Wilder Youth Development Center "following threats to harm himself and others." During the evaluation, Defendant reported a past history of using crack cocaine and alcohol, and selling drugs. Defendant was prescribed Depakote and Seroquel to help control his behavior and aggression.  The evaluator noted that Defendant possessed "adequate verbal skills [and] average intelligence," and concluded that a diagnosis of impulse control disorder was appropriate.

Defendant had two juvenile adjudications for aggravated burglary in 1997, a juvenile adjudication for theft of property valued at less than $500.00 in 1998, a juvenile adjudication for assault in 1999, and juvenile adjudications for burglary of a building and theft of a vehicle in 2001. In addition, Defendant committed several delinquent acts which were "adjusted nonjudicially," which include burglary of a building, evading arrest, vandalism under $500, four acts of criminal trespass, disorderly conduct, and two escapes from the custody of DCS.

In 2003, when he was eighteen years old, Defendant was convicted of aggravated burglary, a Class C felony, and was sentenced as a Range I, standard offender, to three years. Defendant was convicted of two counts of misdemeanor assault and one count of misdemeanor vandalism in February 2005. In November 2005, Defendant was convicted of unlawful possession of a weapon, a Class A misdemeanor.

The trial court found as an enhancement factor that Defendant has a previous history of criminal convictions beyond those necessary to establish his sentencing range. See T.C.A. § 40-35-114(1). The trial court also found that Defendant was adjudicated to have committed delinquent acts as a juvenile that would have constituted a felony if committed by an adult. See id. § 40-35-114(16). The trial court did not find the presence of any mitigating factors and sentenced Defendant in absentia as a Range I, standard offender, to twelve years for his aggravated robbery conviction.

In considering the manner of service of his sentence, the trial court found that Defendant had an extensive record of criminal activity. Id. § 40-35-115(b)(2). The trial court determined that confinement for an extended period of time was necessary to protect society from Defendant who had demonstrated that he was unwilling to lead a productive life, and had resorted "to criminal activity in furtherance of his anti-societal lifestyle." The trial court stated, " I believe that this man, if allowed to walk the streets, is going to end up killing somebody, and that society needs protection from him." The trial court found that the aggregate sentence "is more than reasonable." Although placing no weight on these factors, the trial court also noted on the record that Defendant had expressed no remorse for his conduct and continually displayed disruptive behavior at trial which demonstrated that Defendant appeared "to be someone who is beyond the hope of rehabilitation." Accordingly, the trial court ordered Defendant to serve his sentence for aggravated robbery in case no. 06-04210 consecutive to his effective sentence of thirty-two years in case nos. 06-04209 and 07-01739, for an effective sentence of forty-four years.

Defendant does not challenge the length of his sentence but contends that the trial court erred in ordering Defendant to serve his sentence for aggravated robbery in case no. 06-04210   consecutive to his effective sentence of thirty-two years in case nos. 06-04209 and

07-01739. Defendant argues that the trial court erred in considering his history of juvenile criminal behavior in determining that consecutive sentencing was appropriate. Defendant submits that juvenile adjudications are not the equivalent of adult criminal convictions. He also contends generally without citation to authority that the "use of juvenile court proceeding[s] in criminal court sentencing should not be allowed." Defendant submits that his adult criminal record is not so extensive as to warrant an extended sentence.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. See T.C.A. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is de novo. Carter, 254 S.W.3d at 345 (quoting State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); State v. Pierce, 138 S.W.3d 820, 827 (Tenn . 2004)).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." Carter, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. Included within this criteria is a finding that "[t]he defendant is an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2). The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved" under the circumstances. T.C.A. § 40-35-102(1); § 40-35-103(2). Additionally, whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court. State v. Hastings, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999).

Defendant argues generally that the trial court should not have considered his history of juvenile adjudications in determining whether consecutive sentencing was appropriate. We agree with Defendant that a juvenile adjudication in Tennessee "is not a conviction of crime." T.C.A. § 40-37-133(a). Instead, "the system for dealing with juvenile offenders as juveniles is separate and distinct from the criminal justice system" and was designed to "remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior and substitute therefor a program of treatment, training, and rehabilitation." Id. § 40-37-101(a)(2); State v. Burns, 205 S.W.3d 412, 417 (Tenn. 2006) (emphasis in original). Nonetheless, juvenile adjudications do reflect criminal behavior even though the consequences for such behavior is determined by the juvenile court. This Court has repeatedly approved the consideration of a defendant's history of juvenile adjudications in determining whether a defendant has an extensive record of criminal activity for consecutive sentencing purposes. State v. Gann, 251 S.W.3d 446, 465 (Tenn. Crim. App. 2007); State v. Mickens, 123 S.W.3d 355, 396 (Tenn. Crim. App. 2003); State v. Andre Perkins, No. W2007-02774-CCA-R3-CD, 2009 WL 1741400, at *9 (Tenn. Crim. App., at Jackson, June 17, 2009), no perm. to appeal filed; State v. Robert Donterious Connor, No. M2007-01619-CCA-R3-CD, 2008 WL 4614449, at *14 (Tenn. Crim. App., at Nashville, Oct. 17, 2008), perm. to appeal denied (Tenn. July 27, 2009); State v. Fredrick Arnaz Miller, No. E2005-01583-CCA-R3-CD, 2006 WL 2633211, at *14 (Tenn. Crim. App., at Knoxville, Sept. 14, 2006), perm. to appeal denied (Tenn. Jan. 29, 2007).

Defendant, who was twenty-one years old at the time of the commission of the charged offense, has been engaging in criminal activities since he was nearly twelve years old. His record of juvenile adjudications is extensive and includes adjudications for burglary of a building, aggravated burglary, assault, and theft. Defendant was convicted of aggravated burglary when he was eighteen years old and was sentenced on February 3, 2003, to three years. While on release into the community, Defendant was convicted of vandalism, two counts of assault, and unlawful possession of a weapon. Defendant committed the charged offense on October 15, 2005. Ten days later, on October 25, 2005, Defendant engaged in further criminal conduct which resulted in his conviction of two counts of aggravated robbery,

one count of aggravated assault, and one count of unlawful possession of a weapon by a convicted felon. Because Defendant was convicted of these other four offenses prior to the sentencing hearing for the instant offense, they may be considered for purposes of sentencing. State v. Brandon Shawn Jones, No. E2003-02050-CCA-R3-CD, 2004 WL 1073810, at *2 (Tenn. Crim. App., at Knoxville, May 13, 2004), no perm. to appeal filed (citing State v. Jordan, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003) (considering prior convictions before the sentencing hearing for acts committed after the charged offence for enhancement purposes)).

Based on the foregoing, we conclude that there is ample evidence to support the trial court's determination that consecutive sentencing is appropriate due to Defendant's extensive criminal history, and that an extended sentence is "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved" under the circumstances. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE