**STATE of Tennessee, Appellee,**

v.

**Joseph Glenn BUCK, Appellant.**

Supreme Court of Tennessee,
at Nashville.

Jan. 30, 1984.
Rehearing Denied May 7, 1984.

William M. Leech, Jr., Atty. Gen. and Reporter, Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, for appellee.

Jacky O. Bellar, Bellar & Hall, James B. Dance, Carthage, for appellant.

## OPINION

FONES, Chief Justice.

This is a direct appeal of a death penalty case. Defendant was convicted of criminal sexual conduct, with sentence of life imprisonment, and murder in the first degree with sentence of death. The jury found three aggravating circumstances, to-wit: subsections (2), (6), and (7) of T.C.A. § 39-2-203(i) and no mitigating circumstances. We affirm the conviction of criminal sexual conduct and the sentence. We affirm the conviction of first degree murder but reverse the sentence of death for errors committed during the bifurcated sentencing phase of the trial and remand for a resentencing hearing pursuant to T.C.A. § 39-2-203(k).

We begin with a summary of the material facts adduced on the issue of guilt or innocence of murder.

### I.

The victim was Tina Rose Craighead, a married teenager, mother of a nineteen month old boy. She worked the 2:00 to 10:00 p.m. shift at a self-service Texaco station located at Seventh and Willow Streets in Cookeville, Putnam County, Tennessee. On February 15, 1979, she was the only employee present on the premises from approximately 3:00 p.m. until her disappearance was reported to the police by a customer about 7:30 p.m. About 9:15 p.m. the Sheriff of Smith County received a report that a blonde woman was lying in the road on Highway 141, just off interstate 40 approximately thirty-five miles west of Cookeville. The blonde woman was Tina Craighead. She had a distinct ligature mark around her neck and the pathologist testified that the cause of death was ligature strangulation and that it occurred prior to the infliction of extensive traumatic injuries to the entire body. The station manager checked the records and found that $441 in cash was missing.

A tire pattern was impressed upon her socks, blue jeans, and into the skin of her face, scalp, legs, and chest obviously caused by a vehicle running over her body. The scalp was completely torn away from the skull on the left side. She had multiple rib fractures on both sides of the chest and a compound fracture of the left lower leg. The autopsy examination revealed complete disruption of the liver with portions of it in the abdominal cavity. However, the extensive internal injuries resulted in less blood in the abdominal cavity, about one quart, than would have been the case had her death not preceded those injuries, according to the pathologist. Also, he found a fracture of the cornu of the thyroid cartilage, which he testified documented the fact that the ligature strangulation occluded the airway.

Several customers of the station who knew the victim testified to routine purchases and payment to her in the station booth between 7:00 and 7:15 p.m. on February 15, 1979. Two of the witnesses recalled seeing a Renegade jeep with mag wheels in the station during that timeframe and identified pictures of defendant's jeep as similar to the jeep seen on that date. One of those recalled seeing a man that looked like defendant standing behind the jeep. A third witness who knew defendant and his jeep stopped for the red light at the intersection of Willow and Seventh, looked into the Texaco station and saw defendant standing with his back to his jeep and facing the booth. He observed that defendant was wearing a dark sleeveless jacket and that the jeep was the one he had seen defendant drive on prior occasions. When defendant was brought to Tennessee from Portland, Oregon, where he was arrested, he was wearing a blue, sleeveless down-type vest. A fourth witness entered the station between 7:15 and 7:30 p.m. and filled her car with gas before discovering that no attendant was present. She wrote a note on a check deposit slip advising that she had purchased unleaded gas in the sum of fourteen dollars and that she would be back later to pay with her credit card. She drove about two hundred yards down the street from the station and decided to stop and use a pay phone beside the Tech Food Market to call police. The

pay phone was not working but she went inside the Tech Food Market and called the police and reported that no attendant was present at the station.

Defendant's jeep was found in Roseville, Michigan about a week after the murder and was returned to Nashville. Hair samples were removed from the exterior undercarriage of the jeep. The senior microanalysist at the Tennessee Crime Laboratory made a microscopic comparison of separate hair samples taken from the left rear fender flair and the left rear shock mount with the known hair of the victim and found they were similar in racial origin, coloring, and microscopic structure. Examination of a hair sample taken from the right front seat of the jeep was compared with a known hair sample of the victim, with the same result of compatibility.

All four tires on the jeep were identical in brand, tread and tread wear. The microanalysist compared the pattern on the victim's sock and jeans with a pattern made from the left front tire of the jeep and found them to be identical.

Elizabeth Hood and Robbie Hood were returning home from a basketball tournament in Carthage when they came upon a jeep sitting on the right side of Highway 141, just off I-40 with the right tail light burning and the left tail light out. The jeep moved down the road a short distance as the Hood vehicle approached and then pulled further over and parked. The jeep had plastic window curtains and neither Elizabeth nor Robbie Hood was able to see how many persons were in the vehicle.

Ann Hood West, Robbie Hood's daughter, left Carthage in her own car ten to fifteen minutes after Robbie. She saw a jeep parked at approximately the same place on Highway 141 as described by Elizabeth and Robbie Hood. As she approached the jeep she could see an object in the left lane of the road that could have been a body. The jeep pulled out in front of her at a high rate of speed and although she was going in the same direction at a good speed, it soon disappeared into the

night. She also noticed that the left tail light on the jeep was out.

Elizabeth and Robbie Hood and Ann West saw defendant's jeep at the Tennessee Crime Lab after it was brought there from Michigan and identified it as the same or a similar vehicle that they saw after 8:00 p.m., February 15, 1979, on Highway 141 near the John Lancaster home. The left tail light was out when they examined it at the crime lab.

A left thumb print was lifted from the door to the cashier's booth of the station the night the victim was murdered. It was later identified by a fingerprint expert from the Tennessee Crime Laboratory as defendant's.

Defendant was arrested by F.B.I. agents in Portland, Oregon on October 23, 1979. He was using the name of Ernest William Hinton, a friend of his who lived in Roseville, Michigan. Defendant was fully advised of his rights, signed a waiver and agreed to talk to Agent James Russell without a lawyer. He told Russell that he knew he was wanted for murdering a young woman in Tennessee but that he did not murder her and knew nothing about it. Defendant told the agent that he left Tennessee because he had stolen $250 from two students who attended Tennessee Tech that he had met at Hunter's Bar in Cookeville. Defendant related that the two young men asked him if he knew where they could buy marijuana or grass. He responded that if they had two hundred and fifty dollars he knew where to buy what they wanted; that he did not think they would have that much money but they did and he agreed to take them to buy marijuana; that they left the bar in defendant's jeep, leaving the student's car; that he drove off and on the interstate several times pretending to find the place to buy marijuana, until the student in the back fell asleep and the other one said they had to go to the dorm; that he took them to the dorm but told them that if they would give him the two hundred fifty dollars he would get the stuff and deliver it to them and that they did give him the money. He was

unable to give the agent the names of the students or where the dorm was located or its name.

Defendant continued with his story of that evening's events by further relating that he dropped the students off about 7:00 p.m., went to Pam's Restaurant and ordered hamburgers and french fries to go and then went home to his wife Diane who was pregnant; that he told his wife about getting two hundred and fifty dollars from the students and for that reason did not want to stay at their home that night; that they went to his brother's house in Jackson County to spend the night; that he arrived at his house from Pam's Restaurant between 7:30 and 8:00 p.m., left about 8:30 p.m. and arrived at his brother's house at 9:30 to 10:00 p.m.; that he and his wife were planning to move to Michigan and he decided to leave the next morning with his wife to follow later; that he drove his wife to his mother's house about 7:00 a.m. on February 16, left her there and departed for Michigan.

Agent Russell testified that he told defendant that hair had been found underneath his jeep and asked him why he ran over the young woman after he strangled her. Defendant repeated his denial of any involvement in the murder. Defendant's wife and daughter were staying with him at the motel in Portland where he was arrested, although they were not present at the time of his arrest. Russell asked defendant if he loved his wife and daughter and he responded affirmatively. He was then told that if he used his wife as an alibi witness and she lied for him that he could possibly be subjecting her to a charge of perjury or being an accessory after the fact of murder. According to Russell it was then that defendant admitted that the story he had told about getting the two hundred and fifty dollars from the students was a lie made up to justify leaving Tennessee after the murder; that defendant admitted that he robbed, kidnapped, raped and murdered the station attendant; that he then told what happened that night which Agent Russell wrote out in the form of a statement that defendant read and signed. The

statement was admitted into evidence at the trial.

Defendant's statement related that he used the mouth of a beer bottle concealed under his vest to resemble the barrel of a gun to order the victim to give him the money from the station cash drawer and then to get into the jeep with him; that he drove west on I-40 to the Carthage exit, then south about ten miles where he forced Tina to have intercourse with him; that after they finished she told him he was sick and crazy, that she was going to tell her husband and, "he would get me." Defendant said he wanted to shut her up so he put his arm around her throat and squeezed and she seemed to black out; that he saw the headlights of a car coming, opened the passenger door and pushed her out and drove away to the south before the car arrived; that the money taken from the station was about four hundred dollars. The statement also related that the victim had taken her jeans and panties off and when she put her jeans back on she left her panties off and that defendant threw them out the window somewhere along the interstate. When the victim's body was found she had on jeans but no underpants.

Russell questioned defendant further and he denied using any type of ligature to strangle the victim and insisted that he was not aware that he had run over her.

At trial defendant asserted that the statement he gave Agent Russell in Portland was involuntary and coerced by the threat of prosecution of his wife. In his testimony at trial defendant rejected the facts in the statement which he signed, as coming from him, and testified that those facts were the product of Agent Russell's information received from Tennessee authorities.

Defendant's testimony at trial, wherein he related his activities on the night of the murder, was similar to the first story he told Russell in Portland. However, there was a significant difference. He had told Russell that he went from a dormitory at Tennessee Tech where he dropped the stu-

dents, to Pam's Restaurant for hamburgers and french fries and then home to his wife. At trial he inserted a visit to the Texaco station where Tina worked, around 7:00 p.m., no doubt to account for his thumb print on the pay booth door and the presence of his jeep which several witnesses had seen. He went into great detail at trial explaining everything he did concerning the pumping and paying for five dollars worth of gas. He said that, "I always went to the door when I paid at that gas station," instead of the pay window and expressly said that he opened the door. He testified that he went from the station to Pam's Restaurant and the remainder of the story was not significantly different from the first one that he told Russell in Portland.

Defendant presented witnesses who saw two men in a van at the Texaco station that were said to be acting suspiciously. Another witness said she heard female screams from the station while the van was there and it was shown that the victim's husband remarried soon after the murder. It would be charitable to characterize defendant's proof, attempting to cast suspicion elsewhere, as presenting a scintilla of evidence in support of his innocence.

■ We find the evidence sufficient to convince any rational trier of fact of the guilt of Joe Glen Buck of the premeditated murder of Tina Craighead, fully satisfying the standard prescribed in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and T.R.A.P. 13(e).

## II.

Errors were committed during the sentencing phase of the bifurcated trial in this case that require reversal of the death penalty and remand for a resentencing hearing.

The State relied upon the following aggravating circumstances set forth in T.C.A. § 39-2-203(i):

(2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

. . . .

(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;

(7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb;

. . . .

In support of aggravating circumstance number (2) the State produced a witness, Buddy Franklin, a Cookeville businessman who testified that he caught defendant trying to break into his place of business, the Lucky B Manufacturing Company, a wholesale parts distributing company. He testified that he was on the way to dinner one night and as he passed his business he thought he saw something unusual. He turned around, went back and found defendant crouched down at a window, that was later found to have been pried almost open with a crowbar like instrument. He chased defendant approximately a half mile, caught him and turned him over to the sheriff. Later Franklin asked the sheriff what had happened to the charges against defendant and was told that "this other deal has come up." Franklin testified that the attempted break-in occurred a short time before the murder of Tina Craighead.

David Andrews, an investigator for the Putnam County Sheriff was then called and testified that he took a statement from defendant about the incident involving the Lucky B Manufacturing Company and the statement was offered and admitted into evidence.

Defendant objected to the testimony of both Franklin and Andrews and the admission of defendant's statement on the grounds of lack of materiality being based

upon "something which he has not been charged nor convicted of." The trial judge overruled the objection. In this Court, defendant adds the objection that the State failed to list the names of Franklin and Andrews as witnesses and failed to furnish a copy of the statement defendant gave Andrews as required by T.R.Crim.P. 16, in response to defendant's pre-trial motion for discovery. The State's response insists that defendant has waived appellate review because the objection was not made on the grounds of "relevancy" nor did defendant object at trial on the grounds that he was not furnished the names of the witnesses for the statement pursuant to his discovery motion.

Our reading of the record reveals that defendant raised all of those objections in the course of the testimony of Franklin and Andrews. Almost immediately after Andrews took the witness stand the following occurred:

MR. BELLAR: Your Honor, again, I object to this witness testifying to anything because his name has not been furnished to defense counsel.

GEN. YELTON: I didn't know we were under any furnishing rule at this point in time.

THE COURT: I don't think we are. Would counsel approach the bench?

(Thereupon a bench conference was held on the record, but out of the hearing of the jury, when the following proceedings were had, to-wit:)

THE COURT: I thought you said he was charged with this.

GEN. YELTON: I thought he was too. We had the statement.

GEN. THOMPSON: The only reason he wasn't was because of this.

MR. DANCE: In any event, he wasn't.

GEN. YELTON: That don't change it a bit. I have an eye-witness of him trying to break in a place. I have a statement or his explanation which is as ridiculous as the other one he gave.

THE COURT: All right.

MR. BELLAR: Note the exception.

The trial judge was in error in allowing Franklin and Andrews to testify and was also in error in implicitly sustaining the prosecution in its claim that Rule 16 and discovery rules were not applicable to the sentencing hearing.

We recently held in *State, v. Adkins,* 653 S.W.2d 708 (Tenn.1983), that it was reversible error to permit the State to present evidence at the sentencing hearing that an indictment was then pending against the defendant, charging aggravated assault with a twenty-two caliber pistol; that under the clear language of aggravating circumstance (i)(2) it is only convictions, not mere accusations that are relevant, in accord with the mandate of *Cozzolino v. State,* 584 S.W.2d 765 (Tenn.1979). The excuse of the district attorney that defendant had not been "charged" with and perhaps the implication that he had not been "convicted" because of the intervention of the murder provided no justification whatsoever for the admission of an accusation of an attempted break-in of a business house.

T.B.I. Agent Moore was permitted, over objection, to testify as to defendant's prior criminal record based upon an uncertified copy of a "computer print-out" received through the mail from the National Crime Information Center [N.C.I.C.]. Moore was asked to tell what the N.C.I.C. was and responded as follows:

A The National Crime Information Center is where police agencies can request information and is a consolidation of what little I know about it—

Q Is it the F.B.I. or Department of Justice?

A Yes.

Defendant objected to the introduction of the report, "based on the reasons stated in chambers." The record does not disclose the reasons stated in chambers.

Agent Moore read the contents of the report into the record in the presence of the jury. Nine arrests were listed in the report and presumably where applicable, each arrest report contained a section designated "court data" and a section designated "cus-

tody data." The entire report is in computer jargon with abbreviations that are not found in the dictionary but are presumably known to police officials. The bottom of each page carries the following notation:

OFFICIAL USE ONLY—Arrest data based on fingerprint identification by submitting agency or F.B.I.

We will deal with arrest number one later.

Arrest number two on 4/30/70 in Roseville, Michigan—charged with simple assault. Court data—simple assault. Convicted 5/22/70, thirty days confinement. Later the State introduced a certified copy of the record from the Thirty-Ninth District Court of MaComb County, Michigan, that reported the charge as "assault and battery." This conviction was not admissible in support of aggravating circumstance (i)(2) because it was not a felony.

Arrest number three on 5/16/74 by the Roseville Michigan Police Department. Charged with "agg asslt—pol off," does not reveal any court action or other disposition. Later, the State introduced a certified copy of a one sheet record from the Thirty Ninth District Court of MaComb County, Michigan, that reflected a charge of "assault police officer," the name of defendant's attorney, a plea of not guilty entered and bond set at one hundred dollars. After some illegible handwriting, the last entry on the page, dated 7/3/74 reads "exam held bound over to circuit court bond cont'd." That incident was not admissible because there was no conviction and it was not a felony.

Arrest number four on 5/17/74 by MaComb County, Michigan authorities for parole violation showed a court disposition of dismissal and was not admissible in evidence in this case.

Arrest number five on 9/10/74 in Mount Clemens, Michigan for simple assault. Court data—conviction, fine of eleven dollars. That incident was not a felony and not admissible in evidence and very likely did not involve the use of threat or violence to the person.

Arrest number six on 11/6/74 in Harper Woods, Michigan. Charge—indecent exposure. Court data—convicted, fined two hundred dollars and (other provisions). A certified copy from the Municipal Court of the City of Harper Woods showed the charge on the corresponding date as disorderly person, to-wit: indecent exposure, a two hundred dollar fine and a sixty day suspended sentence. That incident was not a felony, nor did it involve the use or threat of violence to the person.

Arrest number seven on the N.C.I.C. report involved a thirty-eight dollar fine for indecent exposure in Nashville. Arrest number eight was a Nashville charge of making a false report that was dismissed. Arrest number nine was another Nashville arrest, on 10/25/75, for the offense of "flight to avoid—UFAP—from MI." None of those three incidents were admissible.

█ We hold that computer print-outs from the N.C.I.C. are not admissible as a substitute for certified copies of court convictions nor for any other purpose. The information in such reports is pure hearsay, of a dubious degree of accuracy, prepared for purposes other than court use, contains information that is likely to be prejudicial under all circumstances and is not the best evidence of matters that can be proven by reliable, documentary evidence.

The State argues that the "rap" sheet and the information thereon was admissible under T.C.A. § 39–2–203(c), "to establish that the defendant had a significant history of prior criminal activity." The State's brief in this Court relies on *Cozzolino v. State, supra* for the proposition that the prosecution may rebut, in its proof-in-chief, the assumption that defendant will contend that he had no significant history of prior criminal activity. The majority opinion in *Cozzolino* held that one cannot rebut a proposition that has not been advanced. It was the dissenting opinion that held that the Legislature did not intend such a technical meaning of the word "rebut." Also, the State asserts that defendant took the stand during the guilt phase of the trial,

was asked on direct if he had been convicted in Michigan of assault with intent to commit rape and responded affirmatively; that by stopping without revealing his entire criminal record "defendant invited the use of rebuttal proof to negate the favorable impression which may have been created thereby." The Michigan assault to rape conviction was described, not entirely accurately, on the N.C.I.C. report as arrest number one. A certified copy of the court record was properly received in evidence at the sentencing hearing, that showed a conviction on two counts, forcible rape and assault with intent to rape with sentence of five years minimum, ten years maximum. Defendant did not represent directly or indirectly that he had no other criminal record and we do not agree with the State that defendant created an implication from his voluntary admission of the assault to rape charge that he had no additional criminal involvement. The fact is that while he has had "prior criminal activity" the only incident properly admissible, as this case was tried, was the certified copy of the forcible rape and assault with intent to rape conviction.

■ In giving the charge at the conclusion of the sentencing phase of the trial, *the trial judge read to the jury the entire statutory language* [1] setting out the twelve aggravating circumstances [2] and the entire verbage of the eight mitigating circumstances. He had prefaced that reading with an admonition to the jury that some portions would have application and others would not and that it would be up to the jury to determine which sections to apply. The trial judge was in error in charging the jury in that manner. It was his duty to determine which of the aggravating circumstances had been raised by the evidence and thus should be submitted to the jury for its determination as to whether the State had proved beyond a reasonable

doubt each aggravating circumstance so submitted. Of course, his duty was the same with respect to the mitigating circumstances raised by the evidence. The aggravating circumstances and mitigating circumstances which were not raised by the evidence should not have been mentioned in the charge. That is the meaning of the mandate in T.C.A. § 39–2–203(e) that

> [t]he trial judge shall include in his instructions for the jury to weigh and consider any mitigating circumstances and any of the statutory aggravating circumstances set forth in subsection (i) of this section *which may be raised by the evidence* at either the guilt or sentencing hearing, or both. (Emphasis added.)

In *State v. Pritchett*, 621 S.W.2d 127 (Tenn.1981), we applied that rule to the single aggravating circumstance (i)(7) when we held it was error to read to the jury every felony listed in the subsection when the State had offered proof only on one felony, robbery. In *Pritchett* and in *State v. Moore*, 614 S.W.2d 348 (Tenn.1981), we held that the trial judge must also charge the statutory definition of the felony or felonies the State relies upon for submission to the jury under aggravating circumstances (i)(7).

The trial judge's charge of aggravating circumstance (i)(7) omitted the portion of the subsection enclosed in parenthesis as follows:

> (7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, (any first degree murder, arson, rape, robbery,) burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb; [Court's parenthesis.]

---

1. With the exception of (i)(7) which will be discussed later.

2. At a conference in chambers just prior to delivery of the charge, the trial judge said that he had serious doubts as to why he should read

all of the aggravating circumstances but if requested that he would do so. The prosecutors responded that they were relying on two, six and seven, but added that "it can't hurt anything to read them all."

The form signed by the jurors in returning their verdict finding defendant guilty of aggravating circumstance number seven contained exactly the same omission. The omission of rape and robbery and other circumstances point to the inevitable conclusion that the omission was a typographical error in both instances that was overlooked by the trial judge. The felonies raised by the evidence in this case were rape, robbery and kidnapping. The charge of (i)(7) should have been limited to those felonies and each of them should have been defined. *See State v. Pritchett, supra* and *State v. Moore, supra.*

We quote from the record a portion of the district attorney's closing argument:

The jury can either vote life imprisonment or death by electrocution. If the jury is hung, then it is automatically life imprisonment ...

MR. DANCE: Objection, Your Honor.

THE COURT: Overruled.

T.C.A. § 39–2–203(h) expressly prohibits the judge and the attorneys from informing the jury on the effect of their failure to agree on a punishment. Further, defendant asserts that the trial judge specifically instructed all counsel just before argument[3] not to violate that statutory prohibition and the prosecution has not denied that assertion.

■ We approve of the factors adopted by the Court of Criminal Appeals in *Judge v. State,* 539 S.W.2d 340 (Tenn.Crim.App. 1976), to be considered in determining whether prosecutorial misconduct has affected the verdict to the prejudice of defendant and consequently amounts to reversible error. Those factors are "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the

relative strength or weakness of the case." *Id.* at 344.

■ The deliberate act of the prosecutor, sanctioned by the trial judge in the presence of the jury, and magnified by its cumulative effect when considered along with the other errors noted herein, requires a finding by this Court of reversible error. However, it is only fair and accurate to add that the cumulative errors discussed above also would require a finding of reversible error in the conduct of the sentencing phase of this trial had the prosecutor's misconduct not occurred.

### III.

■ Defendant contends that with respect to the conviction of criminal sexual conduct the State failed to establish the corpus delicti, independent of defendant's statement, that there was no evidence whatsoever to corroborate the confession and establish that the crime of rape had been committed.

The pathologist testified that he found no sperm in, or trauma to, the victim's vagina, anus or mouth. Defendant insists that that testimony leaves the State with no evidence, circumstantial or otherwise, that the crime of rape actually occurred.

The applicable law was stated in *Ashby v. State,* 124 Tenn. 684, 139 S.W. 872 (1911), and has been affirmed in identical language many times. *See e.g. Nichols v. State,* 200 Tenn. 65, 289 S.W.2d 849 (1956), and *Ricketts v. State,* 192 Tenn. 649, 241 S.W.2d 604 (1951). Mr. Justice Neil, writing for the Court in *Ashby* said:

"The rule upon this subject, as announced by the later authorities, and the great weight of authority, is that, while the *corpus delicti* cannot be established by confessions alone, yet the confessions may be taken in connection with other evidence, direct or circumstantial, corroborating them, and, if from all of the evidence so considered together the *cor-*

---

**3.** The record does not disclose this admonition but does show the following occurred immediately before the argument began:

THE COURT: I would like to see counsel in chambers for just a minute. This doesn't need to be on the record, Miss Jane.

*pus delicti* and the guilt of the person with reference thereto is established beyond a reasonable doubt, it is the duty of the jury to convict." 124 Tenn. at 697–98, 139 S.W. at 875.

When the victim's body was found she was wearing jeans and she was not wearing panties, exactly as stated by defendant in his confession. The fact that her jeans were unzipped provides some circumstantial corroboration. There was independent evidence that defendant forced Tina to accompany him in his jeep after he had taken $441 in cash at the station and that he drove approximately thirty miles down the interstate to a lonely state road where his jeep was seen parked. Those circumstances point unerringly to the single motivation that defendant's only purpose in kidnapping Tina was to perpetrate the crime of rape. We find no merit in that issue.

### IV.

▮ Defendant insists that the jury panel, grand and petit, were improperly selected. Our reading of the proof on that issue leads us to the conclusion that no identifiable group was substantially under-represented and that defendant was indicted and tried by jurors that reflected a fair cross section of the community. We have found no violation of the three-prong test in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

Defendant raises a number of issues involving the trial judge's conduct of the voir dire examination, excusing certain jurors for cause, failing to excuse certain jurors for cause, rehabilitating certain jurors and failing to adhere to *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in excusing jurors. We have read the transcript of the voir dire and carefully considered all of the alleged errors involving the selection of the petit jury and found them to be without merit.

### V.

Defendant contends that the statement he gave Agent Russell should have been suppressed because he was unlawfully arrested and because it was coerced.

▮ Defendant does not assert that probable cause was lacking for the arrest but predicates his claim upon the fact that F.B.I. agents did not have physical custody of the Federal Fugitive Warrant that had been issued in Nashville, charging him with unlawful flight to avoid prosecution for murder, at the time of his arrest in Portland, Oregon. The existence of the warrant had been made known to Russell and the Portland office of the F.B.I. by teletype.

In *Roynica v. State*, 54 Ala.App. 436, 309 So.2d 475 (1969), cert. denied 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 85 the defendant asserted that his arrest by F.B.I. agents in California, acting on a teletype message from Alabama that a warrant had been issued charging him with unlawful flight to avoid prosecution for murder, was defective because the agents did not have physical possession of the federal warrant in California. The Alabama court held that the agent had lawful authority to arrest defendant having determined that a valid warrant had been issued in Alabama. The United States Supreme Court denied defendant's application for certiorari.

▮ Defendant's basis for the assertion that his confession was coerced is his claim that he made the statement to protect his wife from prosecution. Agent Russell testified that all that he told defendant was that if he used his wife as an alibi witness he could possibly be subjecting her to a perjury sentence if she lied for him. Defendant testified that the agents told him that they had agents at the motel where his wife was and they would pick her up and put her in jail; but that they told him the minute he changed his story they would call them off. Defendant admitted on cross examination that the F.B.I. agents in Portland were fair to him, did not beat him or threaten him. Russell testified that defendant's wife was not taken into custody at any time nor was any threat made to arrest her. Our review is limited to a determination of whether the defendant has carried the burden of showing that the evidence preponderated against the finding of the trial judge that the confession was freely and voluntarily given. *Monts v.*

*State,* 218 Tenn. 31, 400 S.W.2d 722 (1966). Defendant has failed to carry that burden and we find this issue to be without merit.

## VI.

■ Defendant contends that his jeep was the subject of an illegal seizure and search when it was taken into custody at defendant's parent's home in Roseville, Michigan and removed to the Roseville Police Department. It was taken into custody without a warrant but was not searched until a warrant was obtained. The trial judge held that defendant's mother, Marlene Buck, consented to the seizure. However, we prefer to rest the validity of the seizure and the later search upon a warrant, on the substantial evidence that the Tennessee officers had prior to that seizure of the involvement of defendant and his Renegade jeep in the murder of Tina Craighead, which information had been transmitted to the Roseville officers by teletype. When the Roseville officers went to the Buck home they saw the jeep parked in the rear and learned that defendant was not present but would be back. Clearly, there was evidence to support a finding that the vehicle could have been moved during the time that would have been required for the Roseville officers to obtain a warrant. Such exigent circumstances justify the seizure and holding of an automobile until a warrant to search it can be obtained and that was the procedure that was carried out in this case. *See Chambers v. Maroney,* 399 U.S. 42, 40 S.Ct. 1975, 26 L.Ed.2d 419 (1970). This issue is without merit.

We have carefully considered all of the remaining issues presented in the exhaustive brief on behalf of defendant and found them to be without merit.

The convictions of murder in the first degree and criminal sexual conduct are affirmed. The sentence of life imprisonment for criminal sexual conduct is affirmed, but the sentence of death is reversed and this case is remanded to the Smith County Criminal Court for a resentencing procedure pursuant to T.C.A. § 39–2–203(k) and consistent with the rulings herein.

Costs are adjudged against defendant.

COOPER, HARBISON and DROWOTA, JJ., concur.

BROCK, J., concurs in part, dissents in part.

BROCK, Justice, concurring in part; dissenting in part.

I concur in the opinion of the Court in all respects except the constitutionality of the death penalty. With respect to the constitutionality of the death penalty, I adhere to the views expressed in my dissenting opinion in *State v. Dicks,* Tenn., 615 S.W.2d 126 (1981).

## OPINION ON PETITION TO REHEAR

FONES, Chief Justice.

A petition to rehear has been filed on behalf of defendant asserting several propositions that defendant assumes the Court overlooked. We have again considered those issues and arguments and again found them to be without merit.

The Petition to Rehear is denied.

COOPER, BROCK, HARBISON and DROWOTA, JJ., concur.