# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 17, 2009

### STATE OF TENNESSEE v. MARGLE WARD

**Direct Appeal from the Circuit Court for Warren County**
**No. F-11168     Larry B. Stanley, Jr., Judge**

---

**No. M2008-02389-CCA-R3-CD - Filed September 8, 2010**

---

A Warren County jury convicted the Defendant-Appellant, Margle Ward,[1] of facilitation of theft of property over $1,000, a Class E felony. He was sentenced as a multiple offender to a four-year term of imprisonment and assessed $1,332.50 in fines. On appeal, Margle claims (1) the insufficiency of the evidence; (2) the trial court erred in denying his motion to exclude a statement he made to Jeff Panter; (3) the trial court erred in denying his motion to exclude the testimony of Jason Ward; and (4) his sentence was excessive. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Jeremy D. Trapp, Smithville, Tennessee, for the Defendant-Appellant, Margle Ward.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Lisa S. Zavogiannis, District Attorney General; and Thomas J. Miner, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial**. Margle was originally charged with theft of property over $1,000. He was tried with co-defendant, Jessie R. Parker ("Parker"). Jeff Panter, the manager for Hills Creek Nursery, testified that the nursery consisted of 240 acres of land and used aluminum pipes for irrigation. In March of 2007, some of the pipes were stockpiled on a trailer near Hills Creek Road. Panter testified that he saw the pipes on the evening of March 28, 2007, and

---

[1]This case deals with criminal activity involving Margle Ward and his son, Jason Ward. For purposes of clarity, both individuals will be referred to by their first name. No disrespect is meant to either individual.

the next morning they were gone. Panter called the sheriff's department to report the theft. He also called local scrap yards and advised them that the pipes had been stolen and "to be on the lookout." Panter described the pipes as six inches in diameter and thirty feet in length.

One of the scrap yards called Panter and advised him that the pipes were located off of Highway 55 in Warren County. Panter called the police and drove to the location. Upon arrival, Panter recognized the nursery's pipes, which were cut into pieces, sitting in a trailer attached to a truck. The truck had vegetation on its license plate which was the same as that found in the area from where the pipes had been stolen. Panter was shown a photograph of this area, and he identified the vegetation, as well as fresh tire tracks. He said the tire tracks would not have resulted from operations at the nursery.

Panter testified that when he arrived at the location of the recovered pipes, he saw Parker in the back of a patrol car. Panter recognized Parker because Parker's mother and step-father once worked for Panter's father. Panter also saw Margle speaking to an investigator. Panter testified that Margle approached him and "said something to the effect of . . . 'Can I pay you for these pipes that's been cut up and forget about it?'" Panter testified that around 90 pipes were stolen. He was unsure of the total value of the stolen pipes; however, he was paid $8,300 by the insurance company.

On cross-examination, Panter testified that only twenty-five to thirty pieces of pipe were actually recovered. Panter stated that in order to steal the pipes, someone needed to drive across a field. He said he first came into contact with Margle after the pipes were recovered. Panter did not know that Margle was in the scrap metal business.

Deputy Steven Carpenter of the Warren County Sheriff's Department testified that he responded to a call from the Hills Creek Nursery on March 29, 2007. He met with Panter at the nursery. Panter described where the pipes were located on the property before they were stolen. Deputy Carpenter said he went to that location and found a trailer parked in the grass. The trailer had flat tires and was empty. Deputy Carpenter stated that tracks surrounded the trailer suggesting recent travel.

While at the nursery, Deputy Carpenter received information regarding the possible location of the stolen pipes. A scrap yard on Highway 55 had reportedly seen a load of pipes on the other side of the highway. Deputy Carpenter went to that location and found Brian Farmer and Parker cutting pipes with a saw. Parker claimed he got the pipes at Hills Creek Nursery. Parker did not state that he purchased the pipe from a man named Danny Viller. Deputy Carpenter said the pipes were visible from Highway 55 and did not appear hidden.

Jason Margle, the Defendant-Appellant's son, is deaf and testified with the assistance of an interpreter. Jason was asked if he understood the interpreter, and he responded, "Yes. I understand a little. I understand some sign language. But I'm not totally fluent in sign language. Especially finger sign." Jason said he could not read lips. He lived with his father

at his home bordering Highway 55. Jason testified that on the night of the offense, Parker was at Margle's home. Parker was a friend of his father, but Jason did not know Parker personally. Jason explained that Margle and Parker were talking inside of the home. When they finished talking, Margle told Jason to go with Parker; however, Jason was not informed of the destination. At around midnight, Jason said he got into his truck and followed Parker. Jason's truck had a trailer, which he bought from someone named Shawn. Jason testified that he was alone in his truck. Upon arrival at their destination, Jason explained that he was joined by his girlfriend's brother, Chris, and Parker. The three men found the pipes sitting on a trailer, loaded them onto Jason's trailer, and drove away.

Jason was "a little" concerned that they were not authorized to take the pipes. He said he was told to keep quiet while loading the pipes, and his headlights were turned off. Jason drove home after loading the pipes. The pipes were left outside on his trailer. Margle was already asleep when he arrived home. Jason was unsure of the exact time that they left to pick up the pipes. He just remembered that it was dark outside. Jason claimed he did not know that the pipes were stolen.

Chris Bratcher testified that he occasionally did work for Margle at his scrap yard. Bratcher typically worked with Jason on various projects involving scrap metal. On the night of the offense, Bratcher was at Margle's home installing a CD player into Jason's truck. Parker arrived at Margle's home and went inside to speak with Margle. At around 11:00 p.m., Margle directed Jason to go with Parker to load pipes onto Jason's trailer. Bratcher needed a ride home and wanted to earn some money, so he accompanied Jason.

Bratcher recalled hearing that the pipes would be picked up at a woman's home. He was surprised to find that the pipes were "just sitting there on a trailer in the middle of nowhere." Bratcher was concerned about whether he was doing the right thing. He testified that Parker told him to work at a hurried pace. After the pipes were loaded, Bratcher said they "turned around in the field and then . . . took the pipe back to Margle's house." The next day, Bratcher spoke with his mother about what happened, and she called the sheriff's department. Bratcher went to speak with the police on his own volition. He was not charged despite his involvement in the theft.

Bratcher said he heard Lonnie Shawn Miller's ("Miller") testimony from the preliminary hearing. Bratcher testified that the pipes were not picked up from the location testified to by Miller. Bratcher also stated that Miller's testimony was not correct because Miller claimed the pipes were laying in a field, rather than sitting on a trailer. Bratcher said he was aware that Margle owned two scrap yards, one of which bordered Highway 55.

Investigator James Edward Ramsey testified that he responded to a call regarding the stolen pipes. He was informed by deputies that the stolen pipes were located off of Highway 55. Upon arriving at that location, there were several patrol cars already present. Other officers had already spoken with Parker and Farmer. Investigator Ramsey recalled Panter

arriving at the scene and positively identifying the stolen pipes. Investigator Ramsey spoke with Parker after the pipes were recovered. Parker gave a statement that was reduced to writing and signed. In the statement, Parker claimed he bought the pipes from Danny Viller for $150. Parker said he and Jason picked up the pipes as instructed near Myers Cove Road. Parker did not have a bill of sale from the transaction. Investigator Ramsey said he also spoke with Jason. Jason admitted that he drove across the nursery's field. Investigator Ramsey testified that Margle owned two scrap yards and that the pipes were recovered at Margle's scrap yard off of Highway 55.

Miller, who was serving a ten-year sentence based on multiple convictions for theft at the time of trial, was the only witness for the defense. Miller's theft convictions, which occurred between March and April of 2007, resulted from stealing utility trailers. He sold two of these trailers to Jason. Miller stated that while in jail, he learned that Margle was charged with stealing the nursery's pipes. Miller said he informed the police that Margle was innocent and that he was responsible for the theft. Miller claimed he came across the pipes while searching for a trailer to steal. He intended to steal the pipes and the trailer; however, the trailer had flat tires. Miller said he loaded the pipes onto his trailer, dropped them off at another location, and then contacted Parker to see if he was interested in purchasing them. Miller said Parker purchased the pipes for $150. Miller told Parker the location of the pipes, and he provided a bill of sale. Miller said the bill of sale listed his name as Danny Viller, which he used as an alias. Miller did not tell Parker that the pipes were stolen. Miller said he sold the pipes to Parker and had no dealings with Margle. Miller testified that his criminal record includes about fifteen convictions.

On cross-examination, Miller said he knew Jason and Margle for several months before the pipes were stolen. Miller explained that they both knew him as Shawn Miller. Miller said he visited Margle's scarp yard about once a week. Miller also knew Parker from high school. Miller said Parker would have known him from school, although they were not acquaintances. Miller stated that after stealing the pipes, he dumped them in a field. He denied that Jason and Bratcher would have unloaded the pipes off of a trailer.

Following the proof at trial, Margle was acquitted of theft over $1,000. He was convicted of facilitation of theft over $1,000. Margle filed a motion for new trial that was denied.

**Sentencing Hearing**. Charles Bayless testified that he was a minister who served as a spiritual adviser to Margle. Each week, they studied the Bible together for about an hour. Bayless said they had studied together for two years, and they continued to do so even after Margle was imprisoned. Bayless believed that probation would be beneficial to Margle, his family, and the community. Bayless was aware that Margle has a criminal history; however, he believed that Margle was making progress towards becoming a better person.

Gina Smithson said she served as Margle's probation officer. Margle was placed on probation following a conviction for sale of marijuana. Smithson said Margle was on probation when he was charged in the current proceeding. Margle also violated his probation by testing positive for marijuana. Officer Smithson testified that she prepared the presentence report. She said she performed a criminal background search of Margle, and she concluded that the report was accurate.

Margle testified that he was employed by a brick and block company, and he received a consistent income from this job. Margle acknowledged that he had an extensive criminal history; however, he claimed he was taking steps to change his life. He was active with the church, and he claimed he was no longer involved in criminal activity.

The record includes the presentence report. The report lists Margle's prior criminal record, which includes at least twenty-five convictions. These convictions occurred between 1976 and 2006.

At the conclusion of the hearing, the trial court sentenced Margle as a range two, multiple offender. Consequently, the range of punishment was two to four years. The trial court considered the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114, and imposed the maximum sentence of four years. It focused on Margle's extensive criminal history and the fact that he was on probation when he committed the instant offense.

**ANALYSIS**

**I. <u>Sufficiency of the Evidence</u>**. Margle claims the evidence did not support his conviction for facilitation of theft over $1,000. Specifically, he argues the evidence failed to prove that he knew another person intended to steal the pipes or that he knowingly furnished substantial assistance with the theft. In response, the State contends that a rational jury could have found that Margle facilitated the theft. Upon review, we agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is

applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn.1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

We recognize that "[i]n the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). In such a case, the evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). In addition, the evidence "must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt." Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970), perm. to appeal denied (Tenn. Nov. 2, 1970). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613. The trier of fact decides the weight to be given to circumstantial evidence, and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1605-06).

The offense of theft of property is defined under Tennessee Code Annotated section 39-14-103, which states:

A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent.

Section 39-11-403 sets forth the requirements for facilitating a felony. It states:

> (a) A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

First, Margle asserts that the evidence was insufficient because it failed to prove that he knew another person intended to steal the pipes. He claims this case is analogous to State v. Rod Mills, No. E2006-02207-CCA-R3-CD, 2007 WL 1610092 (Tenn. Crim. App., at Knoxville, June 5, 2007), in which this court reversed a conviction for theft based on the insufficiency of the evidence. Id. at *3. In Rod Mills, the defendant worked as a mechanic at a garage. Id. at *1. While employed there, the garage's owner gave him a truck that purportedly served as payment for past work the defendant had done. The truck contained an engine which the owner had stolen from a customer's truck. The engine was found in the defendant's possession during the police's investigation. Id. The owner told a detective that the defendant was not told that the engine was stolen. Id. at *2. On appeal, this court reversed the conviction, concluding that the evidence "did not prove, beyond a reasonable doubt, that the defendant had actual or constructive notice that the truck was stolen at the time he was found with the truck in his possession." Id. at *3. This court referred to the testimony that the defendant received the truck as payment for past work. It also considered the testimony that the defendant was not informed of the theft, that he cooperated with the police's investigation, and that he had not taken steps to hide the theft. Id.

We are not persuaded that this case is analogous to Rod Mills. Margle argues that, like the defendant in Rod Mills, he relied on statements from someone claiming to be the lawful owner of the stolen property. This argument assumes the jury credited Miller's testimony that he was responsible for stealing the pipes and selling them to Parker. Through the guilty verdict, the jury clearly rejected Miller's testimony. The jury had reason to question Miller's credibility given his criminal record, the context of his admission, and the fact that his testimony was rebutted by the proof at trial. Miller claimed he stole the pipes from the nursery and dumped them on the ground in a field. This testimony was rebutted by Bratcher and Jason, both of whom testified that the pipes were situated on a trailer. Bratcher also disputed Miller's preliminary hearing testimony and stated that Miller did not accurately describe the location of the pipes. Additionally, there was testimony from Deputy Carpenter that Parker claimed he got the pipes from the nursery.

Based on the testimony of Jason and Bratcher, there was sufficient evidence that Margle knew Parker intended to steal the pipes. Both witnesses testified that Parker visited with Margle at his home on the night of March 28. At around midnight, Jason said Margle directed him to go "somewhere" with Parker. Jason was not informed of the destination; however, he was told to follow Parker's vehicle. Upon loading the pipes, both Jason and

Bratcher said they were concerned about whether they were authorized to take the pipes. Bratcher testified that Parker had them work at a hurried pace, and the lights on their vehicles were turned off. The pipes were recovered the next day at Margle's scrap yard. Panter testified that when he arrived at the scrap yard, Parker and another individual were cutting the pipes. Based on the foregoing evidence, a rational jury could have found that Margle knew Parker intended to steal the pipes.

Second, Margle argues that the evidence did not show that he knowingly provided substantial assistance in the commission of the theft because he was not seen handling the pipes. We recognize that Margle did not remove the pipes from the nursery; however, we conclude that he furnished substantial assistance in the commission of the offense. As discussed above, Margle met with Parker in private before instructing Jason to assist Parker in retrieving the pipes. Jason complied with his father's instructions even though he did not know Parker personally. Jason's involvement in the theft was critical because his truck and trailer were used to transport the stolen pipes. The pipes were brought back to Margle's property where they remained until they were recovered by the police. Based on these facts, a rational jury could have found that Margle knowingly furnished substantial assistance in the theft of the pipes. Accordingly, Margle is not entitled to relief on this issue.

**II. Rule 408**. Margle claims the trial court erred by denying his motion to exclude a statement he allegedly made to Panter. At trial, Panter testified that he encountered Margle shortly after the pipes were recovered. According to Panter, Margle "said something to the effect of . . . 'Can I pay you for these pipes that's been cut up and forget about it?'" Margle asserts the statement was inadmissible under Rule 408 of the Tennessee Rules of Evidence because it constituted an offer to compromise. Alternatively, he claims this statement should not have been allowed under Rule 403 because it was unfairly prejudicial. The State argues that the trial court properly found that the statement was not an offer of compromise under Rule 408. It also contends that Margle's claim under Rule 403 was waived by his failure to raise the issue either before or during trial. Waiver notwithstanding, the State argues that the statement was not unfairly prejudicial.

Margle filed a pre-trial motion seeking to exclude the statement under Rules 408 and 410 of the Tennessee Rules of Evidence. This motion did not assert Rule 403 as grounds for relief. The motion was addressed at a pre-trial hearing, and Margle claimed the statement was inadmissible under Rule 408. Margle did not raise Rule 403 as a basis for excluding the statement at the pre-trial hearing. Panter was called to testify at the hearing. He said Margle was present when he went to recover the pipes. According to Panter, Margle stated, "'If I pay you for what's been cut up, will you just forget about it?'" Panter explained that he had no prior discussions with Margle about the pipes and that the details of the offer were unclear. Following Panter's testimony, the trial court overruled the motion. It found that Rule 408 was inapplicable because there was no evidence of a "legitimately disputed claim" when the statement was made.

The Tennessee Supreme Court has generally held, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); and State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). A trial court abuses its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

Rule 408 of the Tennessee Rules of Evidence states:

Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. . . . This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution; however, a party may not be impeached by a prior inconsistent statement made in compromise negotiations.

In considering the plain language of Rule 408, the trial court properly denied Margle's motion. The final sentence of Rule 408 states, "This rule also does not require exclusion when the evidence is offered for another purpose, such as . . . proving an effort to obstruct a criminal investigation or prosecution." Here, the testimony regarding Margle's statement was certainly introduced to show that he attempted to obstruct a criminal investigation or to possibly avoid prosecution. Panter said Margle made the statement in the presence of the police after the pipes were recovered. At the time, Panter said Parker was already in the back of a patrol car. Margle claims his case is somehow distinguishable because he made the statement in an effort to protect his son, Jason, who was also involved in the theft. Rule 408 does not specify that the defendant must be the beneficiary of the obstruction; rather, it refers in general terms to the obstruction of "a criminal investigation or prosecution." (emphasis added). Accordingly, we hold that the trial court correctly found that Rule 408 does not require excluding Margle's statement. We note that Tennessee appellate courts have rarely had to consider the applicability of Rule 408 in the context of criminal cases. Our holding is consistent with the approach taken in Hawaii, which has a rule of evidence nearly identical to Rule 408 in Tennessee. See State v. Gano, 988 P.2d 1153, 1161 (Haw. 1999) ("We hold

that, in a criminal trial, evidence of an accused's offer to pay value to a complainant in an attempt to avoid prosecution is not excludable under HRE 408.").

Margle also claims that the statement was inadmissible under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice. However, Margle failed to raise this issue in his pre-trial motion, at trial, or in his motion for new trial. Therefore, this issue is waived. See T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); T.R.A.P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Waiver notwithstanding, we are not persuaded that Margle's statement was inadmissible under Rule 403. Margle's brief contains almost no explanation as to how he was unfairly prejudiced by the statement. It is limited to the following assertion: "The probative value of Appellant's statement was substantially outweighed by the unfair prejudice that resulted as the State tried to use this statement as an admission of guilt." Based on this blanket assertion, we cannot conclude that the trial court abused its discretion. Margle is not entitled to relief on this issue.

**III. Admissibility of Jason Ward's testimony**. Margle claims the trial court should have excluded the testimony of Jason under Rule 403 because it is questionable whether he was able to effectively communicate with the interpreter. In response, the State argues that Margle failed to demonstrate that the interpreter provided inaccurate translations, or any resulting prejudice.

Before trial, Margle made an oral motion to exclude Jason's testimony. At that time, Jason had already entered a best interest plea. Margle claimed it was evident from Jason's testimony at his plea hearing that he struggled to communicate with an interpreter. Margle argued that he would be prejudiced by Jason's testimony at trial, and therefore he should not be allowed to testify. Margle did not specify the legal basis for his argument other than stating that he would suffer prejudice. The trial court overruled Margle's motion, stating:

> I think [Jason] got through [the plea hearing] pretty well, considering all the circumstances. Considering he can't read and that all of that had to be explained to him. But . . . you can renew your objection when he testifies if you want.

At the start of Jason's testimony, he was asked if understood the interpreter, who communicated through sign language. Jason responded, "Yes. I understand some sign language. But I'm not totally fluent in sign language. Especially finger sign." Jason stated that he could not read lips. The interpreter interjected during Jason's testimony on three

separate occasions. In the first instance, she had Jason repeat a response. The second instance related to the use of a leading question. The final instance occurred on cross-examination while defense counsel was questioning Jason about the drive to pick up the pipes. The questioning continued as follows:

DEFENSE: Okay, so Mr. Parker followed you then, correct?

JASON: Ah, yeah. We were going, but I did not know we were going to steal any pipe.

COURT: Was anyone in front of you, leading you?

JASON: It was dark and we turned.

INTERPRETER: I'll be honest with you. Your honor, I'm just not sure at this point what he's trying to say.

COURT: How did you, how did you know the directions to find the pipe?

JASON: Jessie told me. He told me. Then I had the trailer in the back and there was no lights on the trailer. So we had to go there at night to get it.

As previously stated, questions concerning the admissibility of evidence are reviewed for an abuse of discretion. See Pylant, 263 S.W.3d at 870; Forbes, 918 S.W.2d at 449. Here, Margle argues that Jason's testimony was inadmissable under Rule 403 because "the potential for inaccurate translation" was unfairly prejudicial to his defense. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In viewing the trial transcript, Margle's appeal is problematic because he did not object to Jason's testimony. In ruling on the pre-trial motion, the trial court overruled Margle's motion based on Jason's response at his guilty plea. The court advised Margle that he could renew his objection at trial; however, he failed to do so. Our review is therefore limited to the trial court's pre-trial decision to overrule Margle's motion. At that time, the only evidence the trial court had to consider was Jason's testimony at his plea hearing. We have reviewed the transcript from the plea hearing, and it contains no support for Margle's claim. Jason clearly struggled to answer some of the questions; however, there is no

evidence that this was due to his inability to communicate with the interpreter. Additionally, nothing suggests that the interpreter provided an inaccurate translation of Jason's testimony. As a result, the trial court did not abuse its discretion by permitting Jason to testify. Margle is not entitled to relief on this issue.

**IV. <u>Sentencing</u>**. Margle asserts the trial court erred in imposing the maximum sentence of four years. He claims the trial court should not have considered his criminal record in the presentence report because it contained unreliable hearsay evidence. Margle also contends that proper weight was not given to several mitigating factors. In response, the State argues that the trial court could consider the presentence report because it was reliable hearsay. It also claims the trial court properly weighed the mitigating factors.

In sentencing Margle, the trial court relied upon a presentence report from the Tennessee Board of Probation and Parole, which contains a list of Margle's criminal convictions. The report states that it was prepared by Investigating Officer Gina Smithson, who testified at the sentencing hearing. Officer Smithson said she performed a criminal background search of Margle, and she testified that the report was accurate. Officer Smithson was also familiar with Margle's criminal history because she served as his probation officer. Margle objected to the introduction of the report as an exhibit, but the trial court overruled this objection without comment. The report states that Margle has at least twenty-five prior convictions.

Margle acknowledges on appeal that the trial court was permitted to consider reliable hearsay in reviewing his criminal history. <u>See</u> T.C.A. § 40-35-209(b) (2008); <u>State v. Chambless</u>, 682 S.W.2d 227, 233 (Tenn. Crim. App. 1984). He argues, however, that the criminal record included in the presentence report was not reliable. In support, Margle cites to <u>State v. Buck</u>, 670 S.W.2d 600 (Tenn. 1984), in which an uncertified computer print-out from the National Crime Information Center (N.C.I.C.) was used to prove the defendant's criminal record. <u>Id.</u> at 607. The Tennessee Supreme Court held:

> [C]omputer print-outs from the N.C.I.C. are not admissible as a substitute for certified copies of court convictions nor for any other purpose. The information in such reports is pure hearsay, of a dubious degree of accuracy, prepared for purposes other than court use, contains information that is likely to be prejudicial under all circumstances and is not the best evidence of matters that can be proven by reliable, documentary evidence.

<u>Id.</u> Here, an uncertified print-out[2] was also used to prove Margle's criminal record; however, the comparison to <u>Buck</u> is somewhat misplaced because of the additional testimony offered

---

[2]The sentencing hearing transcript shows that the State offered into evidence certified copies of Margle's prior convictions. However, the record does not contain this exhibit.

by Officer Smithson. Officer Smithson testified that she performed a criminal background search, and she personally attested to the accuracy of the report. Officer Smithson was also familiar with Margle's criminal history, having served as his probation officer. Based on this additional testimony, we conclude that the information supporting Margle's criminal history was reliable hearsay. See State v. Adams, 45 S.W.3d 46, 59 (Tenn. Crim. App. 2000) ("This court has consistently held the presentence report to be reliable hearsay."); State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997) ("[T]he information is reliable because it is based upon the presentence officer's research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report); State v. Richardson, 875 S.W.2d 671, 677 (Tenn. Crim. App. 1993). In reaching this conclusion, we find it significant that Margle testified at the sentencing hearing and did not contest the convictions within the presentence report. Instead, he conceded at least three of the prior convictions listed in the report. Margle is not entitled to relief on this issue.

Margle also claims that the trial court failed to give proper weight to several mitigating factors. Specifically, he refers to his lack of involvement in the crime and the insufficiency of the evidence. The trial court found that neither factor was applicable. At the sentencing hearing, the trial court considered the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114, and it imposed the maximum sentence of four years. The sentencing range for a multiple offender is two to four years. The trial court based its decision primarily on Margle's extensive criminal record and the fact that he was on probation when he committed the offense. Our review of the record supports the findings of the trial court. The record shows that the trial court considered the appropriate mitigating and enhancement factors, and that Margle's sentence comports with the principles of the Sentencing Act. As a result, the trial court acted within its discretion in imposing the maximum sentence. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008) (This court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act."). Margle is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.


_____
CAMILLE R. McMULLEN, JUDGE